FILED BY FAX

1   Jordan L. Lurie (SBN 130013)
    Jordan.Lurie@capstonelawyers.com
2   David L. Cheng (SBN 240926)
    David.Cheng@capstonelawyers.com
3   Tarek H. Zohdy (SBN 247775)
    Tarek.Zohdy@capstonelawyers.com
4   Cody R. Padgett (SBN 275553)
    Cody.Padgett@capstonelawyers.com
5   Capstone Law APC
    1840 Century Park East, Suite 450
6   Los Angeles, California 90067
    Telephone: (310) 556-4811
7   Facsimile: (310) 943-0396

8   Attorneys for Plaintiff Jean MacDonald

9             UNITED STATES DISTRICT COURT

10          NORTHERN DISTRICT OF CALIFORNIA

11

12  JEAN MACDONALD, individually,   Case No.:
    and on behalf of a class of similarly
13  situated individuals,           **CLASS ACTION COMPLAINT FOR:**

14              Plaintiff,          (1)  Violations of California Consumer
                                         Legal Remedies Act
15          v.                      (2)  Violations of Unfair Competition
                                         Law
16  FORD MOTOR COMPANY,             (3)  Breach of Implied Warranty pursuant
                                         to Song-Beverly Consumer Warranty
17              Defendant.               Act
                                    (4)  Violation of the Magnuson-Moss
18                                       Warranty Act

19                                  **DEMAND FOR JURY TRIAL**

20

21

22

23

24

25

26

27

28

---

CLASS ACTION COMPLAINT

1      1.     Plaintiff Jean MacDonald ("Plaintiff") brings this action for herself
2   and on behalf all persons in the United States who purchased or leased any 2005
3   through 2008 Ford Escape Hybrid and/or 2006 through 2008 Mercury Mariner
4   vehicles (collectively, "Class Vehicles") designed manufactured, marketed,
5   distributed, sold, warranted and serviced by Ford Motor Company ("Ford" or
6   "Defendant"). Plaintiff alleges as follows upon personal knowledge as to herself
7   and her own acts and experiences, and, as to all other matters, upon information
8   and belief, including investigation conducted by her attorneys.

9               **NATURE OF THE CASE & COMMON ALLEGATIONS OF FACT**

10     2.     This case concerns a defective coolant pump equipped within the
11  Class Vehicle's Motor Electronic Cooling System (MECS) that causes the Class
12  Vehicles to unexpectedly shut down, often at highway speeds. The defect is
13  widespread, unreasonable and unsafe to purchasers of the Class Vehicles. It
14  potentially endangers not only the driver and passengers of the vehicle, but also
15  other drivers on the road and pedestrians on the street.

16     3.     On information and belief, Ford designed the Class Vehicles' MECS
17  coolant system as a nascent effort to design and incorporate hybrid technology
18  into their fleet of vehicles. Theoretically, such a coolant system should, at the
19  very least, function in a way that the vehicle could operate safely and in a
20  manner intended for all automobiles. In practice, however, Ford's Motor
21  Electronics Cooling System has been plagued by numerous problems and safety
22  hazards.

23     4.     This is because the MECS coolant pump contains one or more
24  design and/or manufacturing defects that causes, among other problems, the
25  vehicle to unexpectedly shut down and results in premature failure (the "Coolant
26  Pump Defect").

27     5.     The Coolant Pump Defect causes unsafe conditions, including, but
28  not limited to, an abrupt loss of acceleration, inability to maneuver the vehicle

1  due to reduced speed and, in certain cases, complete vehicle failure. These
2  conditions present a safety hazard because they severely affect the driver's
3  ability to control the car's speed, acceleration, and deceleration. For example,
4  these conditions can make it difficult for a driver to safely navigate through
5  traffic and pull over. Even more troubling, the Coolant Pump Defect can cause
6  the vehicle to fail entirely, thus leaving the driver stranded in the middle of the
7  road if the shoulder cannot be reached.

8      6.      Ford was the first American car manufacturer to design and release
9  a Hybrid crossover vehicle in 2004 when it released the Ford Escape Hybrid, and
10  later its Mercury Mariner twin (hereinafter collectively referred to as "Escape
11  Hybrid").

12      7.      Generally, crossover vehicles are larger than typical sedans, offer
13  more passenger space, engine power and towing capacity. Due to their larger
14  size, they require more engine and transmission power.

15      8.      Each Escape Hybrid is equipped with two different engines that
16  work in tandem. The first is a conventional 2.3 liter, four cylinder gasoline
17  powered internal combustion engine. The second is a sophisticated 65-kw
18  electric traction motor that is powered, in part, by a 330-volt nickel-metal
19  hydride high voltage storage battery. The electric motor is utilized in two
20  situations, the first being when the vehicle begins moving from a stationary
21  point. The second is when the vehicle is operating at freeway speeds. This is,
22  in part, due to the increased power required to move the heavily weighted
23  crossover from a standstill and at higher speeds.

24      9.      Given the heat generated by the Electronically Controlled
25  Continuously Variable Transmission (eCVT) and Hybrid Electric Vehicle (HEV)
26  DC/DC Converter, independent cooling is required to maintain a normal
27  operating temperature. Recognizing this issue, Ford designed and integrated a
28  temperature control system dubbed the MECS into the Class Vehicles. The

1  MECS consists of a degas bottle, outlet hose, degas bottle-to-pump hose, coolant
2  pump-to-transaxle hose, radiator and coolant pump. The MECS coolant pump
3  transfers heat generated by the eCVT and the HEV DC/DC Converter to the
4  atmosphere. The illustration below, taken from a Ford Mechanics Repair
5  Manual, shows the components within Ford's MECS, the coolant pump noted
6  with the number four.

7
8
9
10
11
12
13
14
15
16
17
18
19



N0092656

20  10.  The MECS coolant pump differs from other temperature relief
21  systems in that it lacks a thermostat to gauge the temperature of the system. As
22  such, it is always in an "ON" position when the vehicle ignition is enabled.

23  11.  Summarily, the Motor Electronic Coolant System is designed to take
24  coolant from the degas bottle to the MECS coolant pump. The MECS coolant
25  pump pushes coolant through to the eCVT, lowering its temperature in the
26  process. Coolant is then rerouted from the eCVT back to the MECS, entering
27  into the MECS radiator and then back out, where the coolant ultimately makes
28  its way back to the degas bottle.

1    12.    The following diagram, taken from a Ford Mechanic's Repair
2  Manual, demonstrates how coolant travels from MECS, beginning with the
3  MECS outlet hose (Item 8) to the Transaxle/Transmission and back to MECS
4  with the Transaxle-to-Radiator hose (Item 11).



N0092866

16   13.    Ford owners in surprising numbers have reported multiple episodes
17  of the Coolant Pump Defect to their dealers and to the National Highway Traffic
18  Safety Administration ("NHTSA"). Below is a typical example:

> [2007 FORD ESCAPE HYBRID] I WAS
> TRAVELING NORTHBOUND ON I-95 IN
> MARYLAND, ABOUT 10 MILES SOUTH OF
> ELKTON. WHILE DRIVING IN THE SECOND
> FROM THE RIGHT LANE, IN HEAVY TRAFFIC
> JUST AFTER DARK, THE ENGINE COMPLETELY
> SHUT DOWN, WITH NO WARNING. MY
> INFORMATION SCREEN SAID "HYBRID SYSTEM
> FAILURE, PULL OVER IMMEDIATELY." I HAD
> NO POWER OF ANY KIND, HAD TO NAVIGATE
> HEAVY TRAFFIC AT HIGH SPEEDS, AND PULL
> OVER TO THE SHOULDER. IT WAS VERY
> DIFFICULT AND VERY DANGEROUS TO
> NAVIGATE. AFTER SITTING ON THE SHOULDER
> FOR SEVERAL MINUTES, THE CAR FINALLY
> STARTED, AND I WAS ABLE TO CONTINUE ON
> FOR A FEW MILES BEFORE IT HAPPENED
> AGAIN. AT LEAST I WAS IN THE RIGHT LANE
> THIS TIME. I AGAIN WAITED, AND ONCE AGAIN

Page 4

THE ENGINE STARTED. I PULLED OFF AT THE ELKTON EXIT, AND SPENT THE NIGHT AT A LOCAL HOTEL. THE NEXT MORNING, I CALLED THE LOCAL FORD DEALER, AND WAS TOLD THAT, SINCE I WAS NOT A REGULAR CUSTOMER, THEY COULD NOT HELP ME FOR TWO DAYS. AFTER TOWING THE CAR TO MY HOME DEALER, ABOUT 75 MILES, I WAS INFORMED THAT IT WAS A WATER PUMP FAILURE, NOT A HYBRID SYSTEM FAILURE, AND THEREFORE NOT COVERED BY THE WARRANTY. THIS SEEMED CURIOUS TO ME AS THERE WAS NO INDICATION THAT THE ENGINE WAS OVERHEATING, AND THE CAR ITSELF INDICATED THAT THERE WAS A HYBRID SYSTEM FAILURE. WHY WOULD THEY DESIGN A VEHICLE TO COMPLETELY SHUT DOWN, WITH NO WARNING. I CAN NOT IMAGINE THE PANIC THIS MAY HAVE CAUSED WITH A LESS EXPERIENCED DRIVER. THIS HAD DISASTER WRITTEN ALL OVER IT. FURTHER, I DO NOT UNDERSTAND WHY THIS WAS NOT A WARRANTY ISSUE. THE HYBRID SYSTEM IS SUPPOSEDLY WARRANTED FOR 100,000 MILES. THE SYSTEM SHOULD BE DESIGNED TO WARN THE DRIVER THAT A PROBLEM IS IMMINENT, AND THE ENGINE WILL SHUT OFF IN A SHORT PERIOD OF TIME. AS DESIGNED, THIS IS A TERRIBLE AND DANGEROUS WARNING SYSTEM, AND THE WARRANTY SERVICE FROM FORD IS VAGUE AND AWFUL. *TR *National Highway Traffic Safety Administration.* http://www-odi.nhtsa.dot.gov/owners/SearchResults.action (March 26, 2012)

14. On information and belief, the Coolant Pump Defect also causes premature wear to the transaxle due to overheating, which results in transaxle failure and requires expensive repairs.

15. Beginning as early as 2005, Defendant knew or should have known that the Class Vehicles and the MECS coolant pump contain one or more design and/or manufacturing defects that negatively affect drivability and present safety hazards.

16. Plaintiff is informed and believes, and on that basis alleges that Defendant knew or should have known that the Class Vehicles are defective and not fit for their intended purpose of providing consumers with safe and reliable

1  transportation. Nevertheless, Defendant actively concealed and failed to disclose
2  this defect from Plaintiff and class members at the time of purchase or lease and
3  thereafter.

4      17.    As a result of the Coolant Pump Defect, as early as 2005, Ford
5  issued a Technical Service Bulletin ("TSB") to its dealers in the United States
6  acknowledging defects in the MECS coolant pump. Ford's TSB from 2005,
7  titled "Electric Motor Temperature Indicator Lamp On – Possible DTCS P0A2F,
8  P0A3C, P0A3E, P0A7C," stated that "Some 2005 Escape Hybrid vehicles built
9  between 8/2/2004 and 1/21/2005 may exhibit a red Electric Motor Temperature
10  lamp on, and/or diagnostic trouble codes (DTCs) P0A2F, P0A3C, P0A3C,
11  P0A3E, P0A7C. The vehicle may exhibit a loss of performance. *This may be*
12  *due to the motor electronics coolant pump (MECP) being inoperative.*"
13  (emphasis added).

14      18.    Since that Technical Service Bulletin, Ford has issued at least two
15  more Bulletins concerning the MECS coolant pump that affect all Class
16  Vehicles.

17      19.    Because Ford will not notify Class Members that the coolant pump
18  is defective, Plaintiff and Class Members (as well as members of the general
19  public) are subjected to dangerous driving conditions that often occur without
20  warning.

21      20.    Defendant knew about and concealed the Coolant Pump Defect
22  present in every Class Vehicle, along with the attendant dangerous safety and
23  driveability problems, from Plaintiff and Class Members, at the time of sale,
24  lease, and repair and thereafter. In fact, instead of repairing the defects in the
25  MECS coolant system, Ford either refused to acknowledge their existence, or
26  performed ineffectual repairs that simply masked the defect.

27      21.    If Plaintiff and the Class Members knew about these defects at the
28  time of sale or lease, Plaintiff and Class Members would not have purchased or

1   leased the Class Vehicles or would have paid less for them.

2      22.   As a result of their reliance on Defendant's omissions and/or

3   misrepresentations, owners and/or lessees of the Class Vehicles suffered an

4   ascertainable loss of money, property, and/or value of their Class Vehicles,

5   including, but not limited to, out of pocket costs for the MECS coolant pump,

6   pump assembly, corresponding hoses, MECS radiator and dealership labor fees.

7   Additionally, as a result of the Coolant Pump Defect, Plaintiff and the Class

8   Members were harmed and suffered actual damages in that the Class Vehicles'

9   are substantially certain to fail before their expected useful life has run.

10                **PARTIES**

11   **Plaintiff JEAN MACDONALD**

12      23.   Plaintiff Jean MacDonald is a California citizen who resides in

13   Antioch, California. In or around March 11, 2007, Plaintiff purchased a new

14   2007 Ford Escape Hybrid from Walnut Creek Ford in Walnut Creek, California.

15   Plaintiff's vehicle was manufactured, sold, distributed, advertised, marketed and

16   warranted by Defendant, and bears the Vehicle Identification Number

17   1FMYU49H07KB53401.

18      24.   Plaintiff acquired her vehicle primarily for personal, family, or

19   household use.

20      25.   In or around December 29, 2012, at approximately 43,146 miles,

21   Plaintiff was driving her Escape Hybrid on a freeway when the "Stop Safely

22   Now" light illuminated and it lost power. Plaintiff navigated the powerless

23   vehicle through freeway traffic to the shoulder of the highway. Plaintiff then had

24   the vehicle towed to a nearby Chevrolet dealership. That Chevrolet dealership

25   contacted a nearby Ford dealership who, over the telephone, diagnosed the issue

26   as the MECS coolant pump. After waiting an hour, Plaintiff successfully

27   restarted her vehicle. Plaintiff immediately took it to Future Ford of Clovis.

28   Plaintiff's repair order states "GOT MESSAGE TO PULL OVER SAFELY,

1    LOST THROTTLE AND POWER TURNED OFF." In that same repair order,
2    the mechanics at the Ford authorized dealership stated "FOUND
3    MALFUNCTION WITH THE MOTOR ELECTRONICS COOLING PUMP.
4    NEEDS PUMP REPLACED AND RETESTED". The MECS coolant pump
5    (ID# 5M6Z*8C419*A) was replaced, at a total cost of $767.58.

6        26.    A factor in the purchase of Plaintiff's vehicle was passenger safety.
7    Prior to purchasing her vehicle, Plaintiff took time and effort to compare the
8    Escape Hybrid with other similar and competing vehicles.

9        27.    At all times, Plaintiff, like all Class Members, has driven her vehicle
10   in a foreseeable manner and in the manner in which it was intended to be used.
11   **Defendant**

12       28.    Defendant Ford Motor Company is a corporation organized and in
13   existence under the laws of the State of Delaware and registered with the
14   California Department of Corporations to conduct business in California. Ford
15   Motor Company's Corporate Headquarters is located in Dearborn, Michigan.
16   Ford Motor Company designs and manufactures motor vehicles, parts, and other
17   products for sale in the United States and throughout the world. Ford Motor
18   Company is the warrantor and distributor of the Class Vehicles in the United
19   States.

20       29.    At all relevant times, Defendant was and is engaged in the business
21   of designing, manufacturing, constructing, assembling, marketing, distributing,
22   and selling automobiles and motor vehicle components in California and
23   throughout the United States of America.

24                              **JURISDICTION**

25       30.    This is a class action.

26       31.    Plaintiff and at least some other members of the Proposed Class are
27   citizens of states different from the home state of Defendant.

28       32.    On information and belief, aggregate claims of individual Class

1 | Members exceed $5,000,000.00 in value, exclusive of interest and costs.

2 |     33.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d).

3 | **VENUE**

4 |     34.    Ford, through its business of distributing, selling, and leasing the

5 | Class Vehicles, has established sufficient contacts in this district such that

6 | personal jurisdiction is appropriate. Defendant is deemed to reside in this district

7 | pursuant to 28 U.S.C. § 1391(a).

8 |     35.    In addition, a substantial part of the events or omissions giving rise

9 | to these claims and a substantial part of the property that is the subject of this

10 | action are in this district. In addition, Plaintiff's Declaration, as required under

11 | California Civil Code section 1780(d) but not pursuant to *Erie* and federal

12 | procedural rules, which reflects that a substantial part of the events or omissions

13 | giving rise to the claims alleged herein occurred, or a substantial part of property

14 | that is the subject of this action, is situated in Los Angeles County, California.

15 | Plaintiff's Declaration regarding venue is attached as Exhibit A.

16 |     36.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a).

17 | **Consumer Complaints**

18 |     37.    The Coolant Pump Defect causes unsafe conditions in the Class

19 | Vehicles, including but not limited to abrupt losses of acceleration, inability to

20 | maneuver the vehicle due to reduced speed, slowed steering, and, in certain

21 | cases, complete vehicle failure. These conditions present a safety hazard

22 | because they severely affect the driver's ability to control the Class Vehicle's

23 | speed, steering, acceleration, and deceleration.

24 |     38.    Even more troubling, the defect generally manifests at freeway

25 | speeds, and poses an unreasonable safety risk due to the inherent dangers of

26 | travelling at high speeds. As a result, Plaintiff and Class Members have

27 | experienced their cars simply shutting down while operating at freeway speeds,

28 | quite often while surrounded by other drivers driving at similar speeds.

1    39.    On information and belief, thousands of purchasers and lessees of

2  the Class Vehicles have experienced problems with their MECS coolant pumps.

3  Complaints filed by consumers with the National Highway Traffic Safety

4  Administration ("NHTSA") demonstrate that the defect is widespread and

5  dangerous and that it manifests without warning. The complaints also indicate

6  Defendant's awareness of the problems with the coolant pump and how

7  potentially dangerous the defective condition is for consumers. The following

8  are some safety complaints relating to the Coolant Pump Defect (spelling and

9  grammar mistakes remain as found in the original) (Safecar.gov, *Search for*

10  *Complaints* (March 26, 2013), http://www-odi.nhtsa.dot.gov/complaints/):

11    **NHTSA Complaints:**

12    a.    [2008 FORD ESCAPE HYBRID] I WAS TRAVELING
        THROUGH NYC ON RT 95 DURING RUSH HOUR, BUMPER
13        TO BUMPER TRAFFIC. ALL 3 LANES WERE TRAVELING
        AT 65 MPH WITH NO BREAKDOWN LANE DUE TO
14        CONSTRUCTION IN THE AREA. THE CAR FOR NO
        APPARENT REASON DISPLAYED THE "STOP SAFELY
15        NOW" MESSAGE AND THE ENGINE DIED. BY SOME
        MIRACLE THE JERSEY BARRIERS BLOCKING THE
16        BREAKDOWN LANE OPENED UP FOR ABOUT 100 FT AND
        I WAS ABLE TO PULL OVER. THE CAR LOSES ALL
17        POWER WHEN THE STOP SAFELY NOW MESSAGE
        APPEARS. THIS IS A HAZARD AND THIS CAR SHOULD
18        BE RECALLED FOR THIS PROBLEM. IT TURNED OUT THE
        COOLING PUMP NEEDED TO BE REPLACED. NO CAR
19        SHOULD SIMPLY SHUT OFF WHEN DRIVING. IT
        CREATES AN EXTREMELY DANGEROUS SITUATION. I
20        HAD 18 WHEELERS AND A STREAM OF CARS BEHIND
        ME AND HAD THE BREAKDOWN LANE NOT BEEN
21        AVAILABLE, THERE WOULD HAVE BEEN A MULTIPLE
        CAR CRASH WITH POTENTIAL DEATHS. IT IS HARD TO
22        BELIEVE THAT THERE HAVE BEEN NO ACCIDENTS DUE
        TO THIS PROBLEM. THIS CAR IS UNSAFE TO DRIVE
23        BECAUSE YOU HAVE NO IDEA WHEN THE ENGINE WILL
        SHUT OFF. THE CAR NEEDS TO BE REDESIGNED SO
24        THAT THE STOP SAFELY NOW MESSAGE NEVER SHUTS
        DOWN THE ENGINE. *TR

25
    b.    [2008 FORD ESCAPE HYBRID] I WAS TRAVELING ON
26        THE EXPRESSWAY IN THE LEFT HAND LANE DOING
        ABOUT 70 MPH WHEN THE ENGINE SHUTDOWN AND A
27        STOP NOW SAFELY MESSAGE APPEARED ON
        DASHBOARD. I WAS ABLE TO PULL OVER TURNED OFF
28        THE VEHICLE WAS ABLE TO RESTART AND CONTINUE

Page 10

1   TO MY DESTINATION. THIS AGAIN HAPPENED ON THE
    WAY HOME THE SAME DAY THERE WAS NO PROBLEM
2   FOUND AT THE TIMES I PULLED OVER AND BOTH
    TIMES WAS ABLE TO CONTINUE. I HAD NO ABILITY TO
3   ACCELERATE AND FORTUNATELY WAS ABLE TO PULL
    OVER, THIS WAS A SCARY. *KB

4

    c.   [2008 FORD ESCAPE HYBRID] MY 2008 FORD ESCAPE
5        HYBRID (53,000 MILES) IS DANGEROUS TO DRIVE.
         WHILE DRIVING 70 MPH ON I-5 I HEAR A POPPING
6        SOUND AND SUDDENLY ALL ABILITY TO ACCELERATE
         IS LOST. A RED EXCLAMATION POINT WITHIN A
7        TRIANGLE APPEARS ON THE CONTROL PANEL AND A
         SINCERELY BIZARRE MESSAGE DISPLAYS ITSELF:
8        "PLEASE PULL OVER SAFELY". THIS IS QUITE THE
         CHALLENGE WITH 18 WHEELERS BEHIND ME, TO THE
9        SIDE OF ME, AND OTHER CARS ALL AROUND. WITH
         QUICK REFLEXES, I AM ABLE TO GET OVER TWO
10       LANES AND SLOWLY (I THINK ONLY THE ELECTRIC
         ENGINE IS WORKING, NO GAS) DRIVE OFF THE NEXT
11       EXIT. SITTING IN THE CAR, I AM IN SHOCK. WHAT JUST
         HAPPENED? WILL IT HAPPEN AGAIN? BECAUSE WE ARE
12       ON OUR WAY HOME FROM OREGON TO THE EAST BAY
         AREA IN CA, WE ATTEMPT TO GET BACK ON THE
13       FREEWAY AND MAKE OUR WAY SOUTH. WITHIN 40
         MINUTES THE SAME FAILURE HAPPENS AGAIN, ONLY
14       THIS TIME THERE ISN'T AN EXIT RAMP. WE ARE ON THE
         SIDE OF AN BUSY TWO-LANE SOUTHERN TRAVELING
15       FREEWAY. ONCE SAFELY TO THE SIDE, THE CAR
         RESTARTS AND APPEARS TO BE FUNCTIONING
16       PROPERLY. NOW I AM AFRAID TO DRIVE IT, BUT WANT
         TO GET HOME. I DECIDE TO GO A LITTLE UNDER THE
17       SPEED LIMIT (A HAZARD) AND STAY IN THE LEFT
         LANE. AFTER THE CAR FAILS AND TELLS ME TO "PULL
18       OVER SAFELY NOW" FOR THE 5TH TIME, I DECIDE I
         CAN'T TAKE IT ANYMORE. WE CALL FORD'S ROADSIDE
19       ASSISTANCE NUMBER AND WAIT TWO HOURS (YES!
         TWO HOURS!) FOR A TOW TRUCK, ONLY TO BE CALLED
20       BACK BY AN AUTOMATED DISPATCH THAT GIVES US
         THE NAME OF A DIFFERENT TOWING SERVICE THAT
21       ESTIMATES ITS ARRIVAL TIME IN 2 HOURS (THE FIRST
         COMPANY APPARENTLY HAD TO GO TO A POLICE
22       EMERGENCY TOW, BUT I BELIEVE THEY DIDN'T AGREE
         ON A DECENT WAGE FOR THE SERVICE). NOT WANTING
23       TO WAIT 2 MORE HOURS, I ATTEMPT TO DRIVE AGAIN.
         WITHIN 10 MINUTES, THE CAR FAILS AND WE ARE
24       LUCKY ENOUGH TO GLIDE TO AN OFF RAMP AND INTO
         A GAS STATION PARKING LOT. THANK GOODNESS WE
25       DIDN'T GET ANY FURTHER; THE NEXT STRETCH OF
         FREEWAY HAD NO SHOULDER AT ALL AND THE NEXT
26       PART WAS A LONG BRIDGE. CAR IS NOW AT DEALER
         WAITING FOR MON APPT. *TR

27

    d.   [2008 FORD ESCAPE HYBRID] I WAS DRIVING ON THE
28       FREEWAY AT 71-73MPH WHEN A RED TRIANGLE WITH

---

CLASS ACTION COMPLAINT

AN EXCLAMATION MARK APPEARD, MY ENGINE SHUT OFF, AND A "STOP VEHICLE SAFELY" MESSAGE CAME ACROSS THE DASH. THIS HAPPENED 3 TIMES IN ONE HOUR. EACH TIME, THE ENGINE SHUT OFF, AND I HAD TO PULL OVER. THE CAR WOULD START BACK UP PERFECTLY. I WAS ABLE TO GET THE CAR TO A SHOP BY KEEPING IT UNDER 60MPH ON THE FREEWAY. 3. THE SHOP SAYS I NEED A MOTOR ELECTRONICS COOLING PUMP AND A PCM REPROGRAMMING. *TT

e.    [2007 FORD ESCAPE HYBRID] WHEN THERE IS A FAULT WITH THE ELECTRICAL HYBRID BATTERY SYSTEM, THE VEHICLE CUTS POWER COMPLETELY TO THE ENGINE. IT SIMPLY FLASHES A "STOP SAFELY NOW" MESSAGE. HAVING TO POTENTIALLY CUT ACROSS 4 LANES OF FREEWAY TRAFFIC WITHOUT POWER IS VERY DANGEROUS. I NEARLY HAD AN ACCIDENT SEVERAL TIMES DUE TO THIS. IF THE HYBRID SYSTEM HAS A FAULT, IT SHOULD STILL KEEP THE GAS ENGINE OPERATIONAL. ADDITIONALLY, THE FAULT IS VERY INTERMITTENT, AND MY FORD FACTORY MECHANIC COULD NOT TRACK DOWN ANY DEFINITE CAUSE.

f.    [2007 FORD ESCAPE HYBRID] I WAS TRAVELING NORTHBOUND ON I-95 IN MARYLAND, ABOUT 10 MILES SOUTH OF ELKTON. WHILE DRIVING IN THE SECOND FROM THE RIGHT LANE, IN HEAVY TRAFFIC JUST AFTER DARK, THE ENGINE COMPLETELY SHUT DOWN, WITH NO WARNING. MY INFORMATION SCREEN SAID "HYBRID SYSTEM FAILURE, PULL OVER IMMEDIATELY." I HAD NO POWER OF ANY KIND, HAD TO NAVIGATE HEAVY TRAFFIC AT HIGH SPEEDS, AND PULL OVER TO THE SHOULDER. IT WAS VERY DIFFICULT AND VERY DANGEROUS TO NAVIGATE. AFTER SITTING ON THE SHOULDER FOR SEVERAL MINUTES, THE CAR FINALLY STARTED, AND I WAS ABLE TO CONTINUE ON FOR A FEW MILES BEFORE IT HAPPENED AGAIN. AT LEAST I WAS IN THE RIGHT LANE THIS TIME. I AGAIN WAITED, AND ONCE AGAIN THE ENGINE STARTED. I PULLED OFF AT THE ELKTON EXIT, AND SPENT THE NIGHT AT A LOCAL HOTEL. THE NEXT MORNING, I CALLED THE LOCAL FORD DEALER, AND WAS TOLD THAT, SINCE I WAS NOT A REGULAR CUSTOMER, THEY COULD NOT HELP ME FOR TWO DAYS. AFTER TOWING THE CAR TO MY HOME DEALER, ABOUT 75 MILES, I WAS INFORMED THAT IT WAS A WATER PUMP FAILURE, NOT A HYBRID SYSTEM FAILURE, AND THEREFORE NOT COVERED BY THE WARRANTY. THIS SEEMED CURIOUS TO ME AS THERE WAS NO INDICATION THAT THE ENGINE WAS OVERHEATING, AND THE CAR ITSELF INDICATED THAT THERE WAS A HYBRID SYSTEM FAILURE. WHY WOULD THEY DESIGN A VEHICLE TO COMPLETELY SHUT DOWN, WITH NO WARNING. I CAN NOT IMAGINE THE PANIC THIS MAY HAVE CAUSED WITH A LESS

EXPERIENCED DRIVER. THIS HAD DISASTER WRITTEN ALL OVER IT. FURTHER, I DO NOT UNDERSTAND WHY THIS WAS NOT A WARRANTY ISSUE. THE HYBRID SYSTEM IS SUPPOSEDLY WARRANTED FOR 100,000 MILES. THE SYSTEM SHOULD BE DESIGNED TO WARN THE DRIVER THAT A PROBLEM IS IMMINENT, AND THE ENGINE WILL SHUT OFF IN A SHORT PERIOD OF TIME. AS DESIGNED, THIS IS A TERRIBLE AND DANGEROUS WARNING SYSTEM, AND THE WARRANTY SERVICE FROM FORD IS VAGUE AND AWFUL. *TR

g.   [2007 FORD ESCAPE HYBRID]  I WAS DRIVING ON THE FREEWAY WHEN THE ENGINE SHUT OFF AND 'MASTER VEHICLE ELECTRICAL HAZRARD WARNING LAMP' CAME ON. FORTUNATELY I ONLY HAD TO CROSS ONE LANE IN MODEST TRAFFIC. THE OWNER'S MANUAL INSTRUCTIONS STATE 'STOP THE VEHICLE, SHIFT TO PARK, TURN THE KEY TO OFF POSITION AND ATTEMPT TO RESTART THE VEHICLE. IF THE FAULT REMAINS, THE VEHICLE MAY REQUIRE RESETTING THE SHUT-OFF SWITCHES.' FOLLOWING THE INSTRUCTIONS, I WAS ABLE TO RESTART THE VEHICLE AND CONTINUE DRIVING WITHOUT RESETTING ANY SWITCHES. THE WARNING LIGHT REMAINED OFF AND HAS NOT COME BACK ON AGAIN. I HAVE SHEDULED AN APPOINTMENT TO TAKE THE VEHICLE TO A DEALER. IN THE MEAN TIME I HAVE SEARCHED THE WEB FOR DRIVERS WITH SIMILIAR EXPERIENCES AND HAVE COME ACROSS QUITE A FEW. I PERSONALLY DO NOT FEEL SAFE DRIVING A VEHICLE THAT CAN SHUT OFF WITHOUT WARNING, ESPECIALLY ON A BUSY HIGHWAY. THE FACT THAT FORD HAS INSTRUCTIONS IN THE OWNERS MANUAL FOR 'RESETTING THE FUEL PUMP/HIGH VOLTAGE SHUT OFF SWITCHES' IS ALARMING IN ITSELF ESSENTIALLY I CAN BE TRAVELING IN URBAN RUSH HOUR TRAFFIC AND A COMPUTER CAN DECIDE TO SHUT OFF THE ENGINE. I URGE YOU TO REQUIRE FORD TO ADDRESS THIS DEFECT. *TT

h.   [2006 FORD ESCAPE HYBRID]  DRIVING ON THE INTERSTATE AND THE CAR SHUTS DOWN DISPLAYING A STOP SAFELY NOW ERROR.... APPARENTLY A FAULTY PUMP. THE SAME PUMP THAT WE'VE ALREADY REPLACED 3 TIMES..... NOT ONLY IS THIS ANNOYING BUT IT'S A HUGE SAFETY PROBLEM. THE VEHICLE LOSES ALL POWER! *TR

i.   [2006 FORD ESCAPE HYBRID] I WAS DRIVING DOWN THE HIGHWAY IN MY 2006 FORD ESCAPE HYBRID GOING ABOUT 65 MPH AND STARTED TO ACCELERATE TO PASS ANOTHER VEHICLE AND MY CAR SUDDENLY SHUT DOWN. IT WAS AS IF I SLAMMED ON THE BRAKES. AND I COULD NOT PICK UP SPEED AFTER THAT. THERE WAS NO WARNING ON MY DASHBOARD ONLY THE DISPLAY SAYING TO "STOP SAFELY NOW". I

PULLED OVER AND LET THE CAR IDLE FOR A MINUTE.
THERE WAS STILL NOT OTHER WARNING AND THE CAR
WAS NOT MAKING ANY NOISES AND NO STEAM
COMING FROM HOOD. I SHUT IT DOWN, WAITED A
MINUTE, THEN RESTARTED IT. IT STARTED BACK UP
FINE. NOTHING ON THE DISPLAY NOW AND STILL NOT
MAKING ANY NOISE. I PULLED AHEAD A LITTLE TO SEE
IF IT WOULD MOVE AND IT DID. I LET IT IDLE FOR
ANOTHER MINUTE THEN PROCEEDED BACK ONTO
HIGHWAY TO TRY TO GET HOME. I GOT UP TO ABOUT
40 MPH AND THE SAME EXACT THING HAPPENED. I
PULLED BACK TO SIDE OF HIGHWAY AND CALLED AAA
FOR A TOW TRUCK. WHEN THE TOW TRUCK CAME
ABOUT 1 1/2 HOURS LATER, MY CAR WOULD NOT
START AT ALL AT THAT POINT. TOWED IT TO A SHOP
WHO THEN SAID THE CAR'S OIL WAS NOT READING ON
THE DIPSTICK. I HAD MY OIL CHANGED IN MARCH BY
A REPUTABLE COMPANY AND HAVE ALWAYS HAD MY
OIL CHANGED CONSISTENTLY. THEY TOLD ME MY
ENGINE WAS GONE AND I NEEDED A WHOLE NEW ONE.
I THEN HAD MY CAR TOWED TO A FORD DEALERSHIP,
WHERE I BOUGHT, IT FOR A SECOND OPINION AND HE
SAID THE SAME THING THAT I NEEDED TO HAVE MY
ENGINE REPLACED DUE TO INTERNAL ENGINE NOISE.
THEY ALSO TOLD ME I NEEDED THE THROTTLE BODY
AND COOLANT PUMP REPLACED. THEY ALSO SAID NO
VISIBLE EXTERNAL OIL LEAKS AND NO INDICATION OF
INTERNAL ENGINE USE SUCH AS "BLOW-BY". THEIR
OVERALL ESTIMATE TO FIX MY CAR, INCLUDING A
NEW ENGINE, IS $8000.00. I NEVER HAD AT ANY POINT
ANY INDICATION THAT SOMETHING WAS WRONG
WITH MY CAR. NO NOISES, NO WARNING LIGHTS. I
BOUGHT IT BRAND NEW. I CAN'T AFFORD REPAIRS OF
THAT MAGNITUDE. I CALLED FORD AND THEY SAID
THERE IS NOTHING THEY CAN DO. *TR

j.    [2006 FORD ESCAPE HYBRID] 2006 FORD ESCAPE
HYBRID, RIGHT AFTER THE WARNING "STOP SAFELY
NOW", THE CAR SHUT DOWN RIGHT IN THE MIDDLE OF
THE ROAD, AND IT HAPPENED THREE TIMES ON MY
WAY HOME. AFTER WEB RESEARCH, IT IS QUITE
COMMON FOR THE FORD ESCAPE HYBRID CARS. IT IS
VERY DANGEROUS SINCE THERE IS NO TIME FOR YOU
TO STOP SAFELY BEFORE THE CAR SHUT DOWN, NOT
EVEN A 5 OR 10 SECONDS. THE DEALER CHECK IT OUT,
IT WAS A WATER PUMP FAILURE CAUSED THIS,
CALLED FORD, BUT FORD DENIED ANY ASSISTANCE.
THE REPAIR COSTS MORE THAN $600.00. THIS IS A
SAFETY ISSUE AND IT IS NEED TO BE FIXED. WHO IS
GOING TO DRIVE A CAR WHICH WILL SHUT DOWN IN
THE MIDDLE OF THE ROAD WITHOUT ANY TIME TO
RESPOND TO? *TR

k.    [2006 FORD ESCAPE HYBRID] DRIVING MY FORD
ESCAPE HYBRID ON I 5 WA STATE. WARNING LITE

CAME ON THAT SAID STOP SAFELY NOW AND MY ENGINE HAD STOPPED. I WAS IN THE LEFT LANE ON THE HIGHWAY AND HAD TO UNSAFELY MANEUVER 4 LANES TO THE RIGHT WITHOUT THE ENGINE ON.. I READ MY MANUAL AND IT SAID TO TRY AND START, WHICH IT DID. 3 MILES LATER IT DID IT AGAIN. THIS WENT ON FOR 4 OR 5 MORE TIMES. I GOT OFF THE HIGHWAY AND LIMPED TO A FORD DEALER. THEY REPAIRED IT, IT AS A HYBRID COMPONENT COOLING PUMP. IT COST ME $726.00. THEY WOULDN'T COVER IT. I VIEW THIS AS A SEVERE SAFETY PROBLEM. *TR

l.      [2005 FORD ESCAPE HYBRID] THIS VEHICLE WILL GO INTO "FAIL-SAFE" MODE, WHICH SHUTS THE IC ENGINE OFF WHILE YOU'RE DRIVING AT HIGHWAY SPEEDS, IT HAPPENS VERY INTERMITTENTLY AND NOT IN ANY CONSISTENT PATTERN. ONCE IT HAPPENS, IT CONTINUES TO OCCUR UNLESS THE CAR COOLS OFF COMPLETELY. HAPPENS ONLY WHEN CAR IS USED FOR LONG TRIPS. MULTIPLE FAULT CODES SHOW UP ON THE COMPUTER, AND BASED ON THOSE FAULT CODES, I'VE HAD THE HYBRID COOLANT PUMP REPLACED, THE AIR FILTER FOR THE BATTERIES REPLACED, AND THE FANS THAT COOL THE BATTERY REPLACED. I'VE HAD MULTIPLE TRIPS TO BOTH FORD DEALERSHIP SERVICE AND EXCELLENT INDEPENDENT MECHANICS (WHO WERE BLOCKED ON THE FORD TECHNICAL WEBSITE, EVEN THOUGH THESE INDEPENDENT MECHANICS SUBSCRIBE, FROM FINISHING THEIR RESEARCH INTO REPAIR OPTIONS) WITH THE FINAL RESULTS THAT THEY CAN'T DO ANYTHING TO REPAIR IT. OTHER THAN THIS PROBLEM, IT'S A VERY NICE VEHICLE....... BUT, I'M VERY NERVOUS THAT THIS SHUT-DOWN WILL OCCUR IN FAST, HEAVY TRAFFIC WHERE I CANNOT GET TO THE SIDE OF THE ROAD SAFELY AND CAUSE A HORRIBLE ACCIDENT AND LOSS OF LIFE...... INCLUDING MY OWN OR MY FAMILY. I CANNOT KEEP THIS VEHICLE LONGER...... BUT, IF I TRADE IT OFF.... IT'S ONLY GOING TO BE SOMEONE ELSE'S PROBLEM. THIS SHOULD HAVE BEEN A RECALL ISSUE FOR FORD. GO ONLINE, AND YOU CAN FIND MANY PEOPLE WITH THE SAME PROBLEM, SEVERAL OF WHICH HAVE HAD TERRIFYING EXPERIENCES WITH THIS PROBLEM. FORTUNATELY, MOST OF MY DRIVING WITH THIS VEHICLE IS ON 2-LANE STATE HIGHWAYS WHERE I CAN PULL OFF WHEN THIS HAPPENS. IN THE MIDDLE OF 80-MPH LA TRAFFIC ON A 6 LANE FREEWAY..... IN THE MIDDLE LANE...... I SHUDDER TO THINK. I BOUGHT THIS VEHICLE IN DECEMBER, 2011, AND WILL BE GIVING SOMEONE ELSE THE PROBLEM SOON, AS I CANNOT CONTINUE TO SPEND MONEY ON A VEHICLE THAT NO ONE IS CAPABLE OF FIXING, AND I CANNOT KEEP IT WITH THIS PROBLEM. *TR

m.      [2005 FORD ESCAPE HYBRID] AS DRIVING ON THE

1    HIGHWAY, THE ENGINE SUDDENLY SHUT DOWN, AND
WAS ABLE TO DRIVE TOWARDS THE SHOULDER. AFTER
2    5 MINUTES, I WAS ABLE TO RESTART THE ENGINE. TEN
MINUTES LATER, IT HAPPENED AGAIN, STILL DRIVING
3    THE HIGHWAY @60 MPH. LUCKILY, NO CARS WERE
BEHIND, AND I WAS ABLE TO MOVE TO THE SHOULDER
4    WITHOUT INCIDENT. THE FOLLOWING MONDAY, IT
HAPPENED AGAIN, THREE TIMES . CAR WAS TOWED TO
5    THE DEALER, I WAS TOLD THEY HAVE HAD ANOTHER
CAR THE SAME MORNING, WITH EXACTLY THE SAME
6    PROBLEM. DIAGNOSTICS: NEED TO REPLACE BOTH
HIGH VOLTAGE TRACTION BATTERY COOLING FANS
7    AND TO REPLACE MOTOR ELECTRONICS COOLING
PUMP. WHEN DEALER SEARCHED FOR PARTS, THEY
8    COULD NOT FIND ANY IN MN, BECAUSE APPARENTLY
ALL DEALERS WERE HAVING THE SAME PROBLEM. IT
9    WOULD TAKE SEVERAL DAYS UNTIL THEY WOULD
GET THE PART FROM CA. FORD IS NOT WILLING TO
10    RECOGNIZE THEY HAVE A PROBLEM WITH THE ENGINE
AND BATTERY COOLING SYSTEM, ALTHOUGH IT HAS
11    HAPPENED SEVERAL TIMES. FORD EVEN ISSUED TWO
TECHNICAL SERVICE BULLETINS (TSB 08-24-5 AND TSB
12    09-17-7) ADDRESSING BOTH ISSUES. IT IS A VERY
SERIOUS SAFETY ISSUE, GIVEN THE ENGINE SUDDENLY
13    SHUTS DOWN ON THE HIGHWAY, AND THE CAR NEEDS
TO BE MOVED RIGHT AWAY TOWARDS THE SHOULDER.
14    CAR COULD BE HIT FROM BEHIND FROM ONCOMING
TRAFFIC, GIVEN THE SUDDEN SPEED CHANGE, AND
15    COULD CAUSE FATALITIES. DON'T WANT TO HAVE FOR
ANOTHER FIRESTONE - FORD EXPLORER FIASCO.

16

17    n    [2006 MERCURY MARINER HYBRID] ON I-66W VEHICLE
LOST ENGINE POWER AT HIGHWAY SPEED. DISPLAYED
18    STOP SAFELY NOW AND MASTER VEHICLE
ELECTRICAL HAZARD WARNING LAMP. THE INCIDENT
19    WAS EXTREMELY HARROWING FOR THE DRIVER AS
THE POWER CUTOFF WAS UNEXPECTED AND
20    IMMEDIATE. COASTED TO SHOULDER. A RESTART, PER
THE OWNER MANUAL, WAS ATTEMPTED BUT DID NOT
21    WORK. TRANSPORTED ON FLATBED TO FORD
DEALERSHIP. DEALERSHIP STATED HYBRID BATTERY
22    HARNESS, HYBRID COOLING FANS, AND THROTTLE
BODY NEEDED TO BE REPLACED AND PCM
23    REPROGRAMMED FOR $1900 TO €œFIX ISSUE. OWNER
REQUESTED A NEW 12V FRONT BATTERY AND
24    WARNING CEASED. OWNER DECIDED TO DO SOME
RESEARCH AND TEST DRIVE SHORT DISTANCES. ON
25    5/24 THE ENGINE CUT OFF IN AN OFFICE PARKING LOT.
VEHICLE WAS ABLE TO BE RESTARTED AND GO 4
26    MILES BACK TO RESIDENCE AFTER THE CARPET
COVERING THE HYBRID BATTERY WAS PULLED UP
27    AND THE CABIN A/C TURNED TO HIGH IN AN EFFORT
TO COOL THE BATTERY AREA (IT DID NOT FEEL HOT
28    BUT THE OWNER BELIEVED IF A TEMP READING WAS
THE CAUSE A FEW DEGREES COOLER MIGHT HELP). A

WEALTH OF INFO WAS FOUND INDICATING THIS WAS A KNOWN PROBLEM AND HAD MULTIPLE FORD TECHNICAL SERVICE BULLETINS ISSUED (09-18-6 SEP 09 HYBRID SYSTEMS - RED TRIANGLE ON/DTC P0A27 SET€ ). THE OWNER COMPILED A LIST OF 88 COMPLAINT NUMBERS ON THE NHTSA SITE THAT INDICATE SUBSTANTIALLY SIMILAR EXPERIENCES FROM 2005-2008 FORD ESCAPE HYBRID / MERCURY MARINER HYBRID OWNERS. BELIEVE ROOT CAUSE IS A DESIGN FLAW IN THE PCM S/W THAT REMOVES ENGINE POWER WHEN A MINOR DEVIATION FROM THE NOMINAL BATTERY TEMP RANGE IS SENSED. LIKELY CONTRIBUTING ISSUE IS A POORLY DESIGNED HYBRID BATTERY COOLING SYSTEM (BATTERY HARNESS, BATTERY COOLING FANS, MEC PUMP, BLEND DOOR, RELAYS). THE NHTSA IS URGED TO OPEN AN INVESTIGATION INTO THE STOP SAFELY NOW/MASTER VEHICLE ELECTRICAL HAZARD ENGINE SHUTDOWNS. VEHICLE IS NOT REPAIRED AND CAN BE MADE AVAILABLE FOR INSPECTION. *TR

**Edmunds Internet Postings:**

a) I recently was (stranded out of town) due to a failure on the electric motor coolant pump. I was towing a small utility trailer along an old jeep trail, so I was in electric mode most of the time. The dealer service rep said that this had nothing to do with the problem, but I'm not convinced. The rep also said that this problem was on the Ford "hotline, " so it is happening to other vehicles. Anyone else have this problem? If not, be careful if you are off-road!

Also, a reply to Jim regarding the whine at low speeds. I hear it also. I think that it is nothing to worry about and just noise from the motor/generator spinning. Anyone else? (Edmunds, *Ford Escape Hybrid – Car Forums Edmunds* (accessed March 25, 2013), http://townhall-talk.edmunds.com/direct/view/.ef0f4df/1179#MSG1179)

b) We had this problem yesterday in a 05 FEH. Started off as a High Motor Temperature light, followed by the Triangle of death and total shutdown in the middle of traffic. Upon lifting the hood could not smell a hot motor, both coolant reservoirs full and not hot to touch. Glad of second vehicle. The next day car started with no alarms present?

Who were these 4 clowns in Canada that could not help you? I need to book with a dealer in the Red Deer Alberta area to get this fixed. Was it the electronic coolant pump? (Edmunds, *Ford*

*Escape Hybrid Engine Problems– Car Forums  Edmunds* (
accessed March 26, 2013), http://townhall-
talk.edmunds.com/direct/view/.f0ff5b5/62#MSG62)

c) I was on the highway when my car shut off without warning. I
was 4 hours from home so found a dealer and it has been 2weeks
without my car, they are waiting on a part under warranty for the
electronic water pump. I had to rent a car which has cost me
650,00 and adding up daily. Ford won't reimburse me for the
rental and when my car does get fixed I have to take off of work
and drive 4 hours away to pick up my car. I have LOVED this
car for 2 years but this has really made me think it is not a
reliable vehicle. anyone else have this issue and how long did it
take to get the part?. (Edmunds, *Ford Escape Hybrid Engine
Problems– Car Forums  Edmunds* (accessed March 26, 2013),
http://townhall-
talk.edmunds.com/direct/view/.f0ff5b5/63#MSG63)

d) Mine failed 5 times then I did not have problem for 600 miles.
Parked it in my garage and called my Ford dealer to order the
part and I was informed that I was number 800 thats right 800 on
the bakcorder list. That was two weeks ago and they still do not
have it. I emailed Ford about this and they had the dealer contact
me. Which did no good as I had already spoke to them. So
having Ford belly up looks like it will not happen. NUMBER
"800" ON THE BSCKORDER LIST.. (Edmunds, *Ford Escape
Hybrid Engine Problems– Car Forums  Edmunds* (accessed
March 26, 2013), http://townhall-
talk.edmunds.com/direct/view/.f0ff5b5/71#MSG71)

e) I just ran into the same problem. It cost me $700 to get fixed at
the Ford dealership. They charged me $100 just to diagnose the
problem, and $600 to fix it. The electrical cooling pump had to
be replaced. I no longer feel safe driving this car and am also
contacting Ford as the computer coding that makes the car shut
off while driving is flawed and extremely dangerous. I can't
believe there has been no recall on this. I was driving in rush
hour traffic on the highway in NYC with 3 lanes of traffic going
65+ bumper to bumper when I got the beep, the red triangle, Stop
Safely Now message, and the engine completely quit. There was
no breakdown lane and me and my 2 children were nearly killed
trying to get off the highway with absolutely no power, never
mind that I still had 180 miles to drive to get home to MA.
Luckily the jersey barriers blocking the breakdown lane opened
up for about 100 ft so that I had some place to stop but it was
treacherous! And this is a safety issue that appears to have been
happening since 2005! The engine also completely shut down 4
times on a 2 mile stretch while driving to work in rush hour

1

2

3

4

traffic. That is what prompted me to get it to the dealer last week. My local mechanic would not work on it. He referred me to the dealership. (Edmunds, *Ford Escape Hybrid Engine Problems– Car Forums Edmunds* (accessed March 26, 2013), http://townhall-talk.edmunds.com/direct/view/.f0ff5b5/77#MSG77)

5

6

7

8

9

f) Same problem with my 2007 Escape Hybrid, 55mph, boxed-in traffic, red kiss-of-death triangle, beeping, stop safely now (ha ha) message. Water pump diagnosis, $750 for the part, $150 for the "computer diagnosis", part has to be ordered. Someone is going to get hurt or killed by this defect! (Edmunds, *Ford Escape Hybrid Engine Problems– Car Forums Edmunds* (accessed March 26, 2013), http://townhall-talk.edmunds.com/direct/view/.f0ff5b5/90#MSG90)

10

11

12

13

14

15

g) Tonight on the 405 freeway my 2008 Escape Hybrid with only 28,000 miles had the red lights come on and started to come to a complete stop on the freeway. Crazy traffic, I barely made it to the side before my car just stopped on the freeway. Has this happened to you again? It was really scary. I almost got into a horrible accident. What did Ford say / do? (Edmunds, *Ford Escape Hybrid Engine Problems– Car Forums Edmunds* (accessed March 26, 2013), http://townhall-talk.edmunds.com/direct/view/.f0ff5b5/92#MSG92)

16

17

h) As mentioned by a few posters before this one, our '07 Mariner Hybrid AWD (bought in '06) some times issues the message STOP SAFELY NOW !

18

19

20

21

It has occurred on road trips (not on everyday local driving) and usually when we have it loaded with cargo creating weight. I was thinking it be some kind of temperature(heat) problem with battery ventilation or, it might be something about the trans axel as described in post 101 & 102.

22

When it occurs we get off the highway ASAP because the darned thing is unresponsive to throttle! Scary!

23

24

25

I get out and sniff around the outside and underneath to see if there is any abnormality. Haven't seen, heard or smelled anything out of the ordinary on any of the 3 occasions it has happened.

26

27

28

We let the vehicle sit for 10-15 minutes. Then we start the puppy up and...off we go. Generally speaking, the message does not return and we stay below the speed limit and in the right hand lane just incase the loss of power happens again.

FWIW, The vehicle never has the problem just described when there are just 2 or 3 people and no cargo load. Since I know this much...duh... I don't want to fart around with our local Dealership's Service shop because they will probably say it is not unique to the hybrid 100,000 mile component warranty.

I'll just have live with it....because I ain't got much money (Edmunds, *Ford Escape Hybrid Engine Problems– Car Forums Edmunds* (accessed March 26, 2013), http://townhall-talk.edmunds.com/direct/view/.f0ff5b5/106#MSG106)

    i)   http://www.safercar.gov/

WILL take your report - twice my car stopped in the middle of big-time LA traffic - frightening experience. Took it to dealer the first time in 2011, they said it was fine. Happened again a week ago and they said it was a coolant pump and charged me accordingly. This should be a recall issue but the recall only happens when the government steps it. So file complaints with the National Highway Agency - link is given above. PLEASE FILE. This should be recalled. (Edmunds, *Ford Escape Hybrid Engine Problems– Car Forums Edmunds* (accessed March 26, 2013), http://townhall-talk.edmunds.com/direct/view/.f0ff5b5/108#MSG108)

    j)   I got the MECS and blend door actuator yesterday at the dealership for 1157. parts 496 and labler 680$ for what had to be 2hour of having it and 1 hour of work based on dropping it off and when they called back.

TSB 08-24-5 states that some 2005-2008 Escape Hybrid and 2006-2008 Mariner Hybrid vehicles may exhibit a red triangle light and codes indicating a transaxle overtemp. This condition may result in reduced power as the system activates fail safe operation. Codes P1A0E, P1A0F, P0A3C, P0A3E, P0A7A, P0A7C and P1A0D may also be set(Edmunds, *Ford Escape Hybrid Engine Problems– Car Forums Edmunds* (accessed March 26, 2013), http://townhall-talk.edmunds.com/direct/view/.f0ff5b5/113#MSG113)

40.    The Coolant Pump Defect poses an unreasonable safety risk for Class Members, as well as the drivers, passengers, and pedestrians sharing the road with Class Vehicles. A vehicle's ability to travel without sudden losses of acceleration is critical to a vehicle's safe operation. A defect that causes one or more of these negative characteristics poses a safety hazard to the general public,

1  and increases the risk of automobile accidents.

2  **Ford Had Exclusive Knowledge of the Coolant Pump Defect**

3  41. Ford had superior and exclusive knowledge of the Coolant Pump
4  Defect, and knew or should have known that the defect was not known or
5  reasonably discoverable by Plaintiff and Class Members before they purchased
6  or leased the Class Vehicles.

7  42. Plaintiff is informed and believes and based thereon alleges that
8  before Plaintiff purchased his Class Vehicle, and since at least 2005, Ford knew
9  about the Coolant Pump Defect through sources not available to consumers,
10  including pre-release testing data, early consumer complaints about the coolant
11  defects to Ford and its dealers including high warranty reimbursement rates and
12  repair orders, testing conducted in response to those complaints, high failure
13  rates and replacement part sales data, aggregate data from Ford dealers,
14  consumer complaints online reported by Ford customer care agents on internet
15  forums, among other internal sources of aggregate information about the
16  problem.

17  43. In a media press release, Ford stated Mr. Tom Watson, Ford's
18  Hybrid Electric Vehicle Propulsion System engineering manager, was
19  responsible for "Leading the Ford Motor Company powertrain team that
20  developed the first American hybrid."[1]

21  44. In a 2006 interview regarding the use of a fleet of Ford Escape
22  Hybrids as taxis in New York and San Francisco, that same Mr. Watson stated
23  "Several water pumps blew at the 50,000 mile mark, a situation that has been
24  rectified."[2]

25

26  [1] Ford Engineer Wins Magazine's Engineer of the Year Award For Hybrid
Work (June 19, 2013)
27  (http://media.ford.com/article_display.cfm?article_id=23427)
   [2] Hybrid Cabs Take a Licking ... But Their Meters Keep Ticking (June 19,
28  2013) http://media.ford.com/article_display.cfm?article_id=23083

1    45.    However, in practice, the situation was not rectified. Numerous
2  consumers have experienced the Coolant Pump Defect and the subsequent safety
3  risks.

4    46.    Contrary to Ford's public representations, many Class Members'
5  coolant pumps have failed recently, similar to Plaintiff's. As detailed above via
6  NHTSA and Edmunds complaints, scores of consumers online have reported
7  coolant pump failures. These failures are due to the Coolant Pump Defect.

8    47.    Moreover, Ford has been aware of the Coolant Pump Defect since at
9  least 2005, when it issued Technical Service Bulletin 05-4-10, titled "Electric
10  Motor Temperature Indicator Lamp On – Possible DTCS P0A2F, P0A3C,
11  P0A3E, P0A7C. Ford described the issue as "Some 2005 Escape Hybrid
12  vehicles built between 8/2/2004 and 1/21/2005 may exhibit a red Electric Motor
13  Temperature lamp on, and/or diagnostic trouble codes (DTCs) P0A2F, P0A3C,
14  P0A3C, P0A3E, P0A7C. The vehicle may exhibit a loss of performance. *This*
15  *may be due to the motor electronics coolant pump (MECP) being inoperative.*"
16  (emphasis added). Ford clearly had knowledge of the Coolant Pump Defect
17  since at least 2005.

18    48.    Further, Ford released their most current data relating to the Coolant
19  Pump Defect in November of 2008, when it issues its third Technical Service
20  Bulletin addressing the issue. In or around November 20, 2008, Ford issued
21  TSB 08-24-5, titled "OVERHEATING – ALL HYBRID APPLICATIONS." In
22  that TSB, Ford stated that "Some 2005-2008 Escape Hybrid and 2006-2008
23  Mariner Hybrid vehicles may exhibit a red triangle light and codes indicating a
24  transaxle overtemp. This condition may result in reduced power as the system
25  activates fail safe operation." The TSB then outlines instructions to the
26  authorized Ford mechanic to replace the MECS coolant pump with a non-
27  defective model.

28    49.    The existence of the Coolant Pump Defect is a material fact that a

1    reasonable consumer would consider when deciding whether to purchase or lease

2    a vehicle that was equipped with the MECS coolant pump. Had Plaintiff and

3    other Class Members known that the Class Vehicles were equipped with

4    defective coolant pumps, they would not have purchased or leased the Class

5    Vehicles equipped with the MECS coolant pump or would have paid less for

6    them.

7        50.     Reasonable consumers, like Plaintiff, reasonably expect that a

8    vehicle's coolant pump is safe, will function in a manner that will not pose a

9    safety hazard, and is free from defects. Plaintiff and Class Members further

10    reasonably expect that Ford will not sell or lease vehicles with known safety

11    defects, such as the Coolant Pump Defect, and will disclose any such defects

12    when it learns of them. They did not expect Ford to fail to disclose the Coolant

13    Pump Defect to them and to continually deny the defect.

14                **Ford Has Actively Concealed the Coolant Pump Defect**

15        51.     While Ford has been fully aware of the Coolant Pump Defect in the

16    Class Vehicles, it actively concealed the existence and nature of the defect from

17    Plaintiff and Class Members at the time of purchase, lease or repair and

18    thereafter. Specifically, Ford failed to disclose or actively concealed at and after

19    the time of purchase, lease, or repair:

20            (a)     any and all known material defects or material nonconformity

21                  of the Class Vehicles, including the defects relating to the

22                  MECS coolant pump;

23            (b)     that the Class Vehicles, including their MECS coolant pump,

24                  were not in good in working order, were defective, and were

25                  not fit for their intended purposes; and

26            (c)     that the Class Vehicles and their MECS coolant pump were

27                  defective, despite the fact that Ford learned of such defects

28                  through alarming failure rates, customer complaints, as well

1                          as through other internal sources, as early as 2005.

2         52.  As a result of the Coolant Pump Defect, Ford was inundated with

3  complaints.  Since 2005, Ford has released no less than 3 different Technical

4  Service Bulletins relating to the MECS coolant pump.  In 2005, Ford issued TSB

5  05-4-10 titled "ELECTRIC MOTOR TEMPERATURE INDICATOR LAMP

6  ON."  Later, in 2008, Ford issued TSB 08-15-1, titled "OVERHEATING –

7  COMMERCIAL APPLICATIONS."  In TSB 08-15-1 Ford stated that it

8  superseded TSB 05-4-10.  In November of 2008, Ford issued TSB 08-24-5, titled

9  "OVERHEATING – ALL HYBRID APPLICATIONS."  In TSB 08-24-5, Ford

10  stated that it superseded TSB 08-15-1.  All three Technical Service Bulletins list

11  the Motor Electronics Coolant Pump as the potential cause of overheating and

12  call for its replacement.

13         53.  Ford has caused Plaintiff and Class Members to expend money at its

14  dealerships to repair or replace the Class Vehicles Motor Electronic Coolant

15  Pump despite Ford's knowledge of the Coolant Pump Defect.

16         54.  When consumers present the Class Vehicles to an authorized Ford

17  dealer for repair of the coolant pump, rather than repair the problem under

18  warranty, Ford dealers typically tell consumers they must pay for the repair.

19         55.  To this day, Ford still has not notified Plaintiff and the Class

20  Members that the Class Vehicles suffer from a systemic defect that causes the

21  coolant system to malfunction.

22         56.  Ford has caused Plaintiff and Class Members to expend money at its

23  dealerships to diagnose, repair or replace the Class Vehicles' coolant pump,

24  despite Ford's knowledge of the Coolant Pump Defect.

25                    **TOLLING OF THE STAUTE OF LIMITATIONS**

26         57.  Because the defects in the design and/or manufacturer of the Class

27  Vehicles and their coolant systems cannot be detected until manifestation,

28  Plaintiff and the Class Members were not reasonably able to discover the

1 | problem until after purchasing or leasing the Class Vehicles, despite their
2 | exercise of due diligence.

3 | 58. Plaintiff and the Class Members had no realistic ability to discern
4 | that the coolant systems were defective until the coolant pump prematurely
5 | failed, nor would Plaintiff and class members have reason to believe that
6 | problems they encountered were caused by a widespread, systemic defect.
7 | Therefore, the discovery rule is applicable to the claims asserted by Plaintiff and
8 | the Class Members.

9 | 59. Plaintiff is informed and believes and based thereon alleges that
10 | Ford has known of the Coolant Pump Defect since 2005, if not earlier, and has
11 | concealed from or failed to alert owners and lessees of the Class Vehicles of the
12 | defective nature of their coolant systems.

13 | 60. Any applicable statute of limitation has therefore been tolled by
14 | Ford's knowledge, active concealment, and denial of the facts alleged herein.
15 | Ford is further estopped from relying on any statute of limitation because of its
16 | concealment of the defective nature of the Class Vehicles and their coolant
17 | systems.

18 | **CLASS ACTION ALLEGATIONS**

19 | 61. Plaintiff brings this lawsuit as a class action on behalf of herself and
20 | all others similarly situated as members of the proposed Class pursuant to
21 | Federal Rules of Civil Procedure 23(a) and 23(b)(3). This action satisfies the
22 | numerosity, commonality, typicality, adequacy, predominance, and superiority
23 | requirements of those provisions.

24 | 62. The Class and Sub-Class are defined as:

25 | **Class**: All individuals in the United States who
purchased or leased any 2005 through 2008 Ford
26 | Escape Hybrid or 2006 through 2008 Mercury Mariner
Hybrid vehicles.
27 |
**California Sub-Class**: All individuals who purchased
28 | or leased any 2005 through 2008 Ford Escape Hybrid

1    or 2006 through 2008 Mercury Mariner Hybrid vehicles
     in the State of California.

2

3    63. **CLRA Sub-Class**: All California Class Members who are

4    "consumers" within the meaning of California Civil Code § 1761(d) ("the CLRA

5    Sub-Class").Excluded from the Class and Sub-Classes are: (1) Defendant, any

6    entity or division in which Defendant has a controlling interest, and their legal

7    representatives, officers, directors, assigns, and successors; (2) the Judge to

8    whom this case is assigned and the Judge's staff; and (3) those persons who have

9    suffered personal injuries as a result of the facts alleged herein. Plaintiff reserves

10   the right to amend the Class and Sub-Class definitions if discovery and further

11   investigation reveal that the Class and Sub-Class should be expanded or

12   otherwise modified.

13   64. Numerosity: The Class here numbers in the tens of thousands,

14   making joinder impracticable. The disposition of the claims of these Class

15   Members in a single action will provide substantial benefits to all parties and to

16   the Court. The Class Members are readily identifiable from information and

17   records in Defendant's possession, custody, or control, as well as from records

18   kept by the departments of motor vehicles of the various states.

19   65. Typicality: The claims of the representative Plaintiff are typical of

20   the claims of the Class in that the representative Plaintiff, like all Class

21   Members, purchased and leased a Class Vehicle designed, manufactured, and

22   distributed by Defendant and equipped with a defective coolant system. The

23   representative, like all Class Members, has been damaged by Defendant's

24   misconduct in that he has incurred or will incur the cost of repairing or replacing

25   the defective coolant system. Furthermore, the factual bases of Defendant's

26   misconduct are common to all Class Members and represent a common thread

27   resulting in injury to all Class Members.

28   66. Commonality: There are numerous questions of law and fact

Page 26

CLASS ACTION COMPLAINT

1 | common to Plaintiff and the Class that predominate over any question affecting
2 | only individual Class Members. These common legal and factual issues include
3 | the following:

4 |      (a)    Whether the Class Vehicles contain defects relating to the
5 |         coolant system;

6 |      (b)    Whether the defects relating to the coolant system constitute
7 |         an unreasonable safety risk;

8 |      (c)    Whether Defendant knew about the defects relating to the
9 |         coolant system and, if so, how long Defendant has known of
10 |         the defect;

11 |      (d)    Whether the defective nature of the coolant system constitutes
12 |         a material fact;

13 |      (e)    Whether Defendant's have a duty to disclose the defective
14 |         nature of the coolant system to Plaintiff and Class Members;

15 |      (f)    Whether Plaintiff and the other Class Members are entitled to
16 |         equitable relief, including, but not limited to, a preliminary
17 |         and/or permanent injunction;

18 |      (g)    Whether Defendant should be declared financially responsible
19 |         for notifying all Class Members of the problems with the
20 |         Class Vehicles and for the costs and expenses of repairing and
21 |         replacing the defective coolant systems;

22 |      (h)    Whether Defendant is obligated to inform California Class
23 |         Members of their right to seek reimbursement for having paid
24 |         to diagnose, repair, and replace their defective coolant
25 |         systems;

26 |      (i)    Whether Defendant breached the implied warranty of
27 |         merchantability pursuant to the Song-Berverly Act; and

28 |   67.    Adequate Representation: Plaintiff will fairly and adequately

1    protect the interests of Class Members. Plaintiff has retained attorneys

2    experienced in the prosecution of class actions, including consumer and product

3    defect class actions, and Plaintiff intends to prosecute this action vigorously.

4        68.    Superiority: Plaintiff and the Class Members have all suffered and

5    will continue to suffer harm and damages as a result of Defendant's unlawful and

6    wrongful conduct. A class action is superior to other available methods for the

7    fair and efficient adjudication of the controversy. Absent a class action, most

8    Class Members would likely find the cost of litigation their claims prohibitively

9    high and would therefore have no effective remedy at law. Because of the

10    relatively small size of individual Class Members' claims, it is likely that only a

11    few Class Members could afford to seek legal redress for Defendant's

12    misconduct. Absent a class action, Class Members will continue to incur

13    damages, and Defendant's misconduct will continue without remedy. Class

14    treatment of common questions of law and fact would also be a superior method

15    to multiple individual actions or piecemeal litigation in that class treatment will

16    conserve the resources of the courts and the litigants and will promote

17    consistency and efficiency of the adjudication.

18        69.    In the alternative, the Class may be certified because:

19            (a)    The prosecution of separate actions by the individual

20                 members of the Class would create a risk of inconsistent or

21                 varying adjudication with respect to individual Class

22                 Members, which would establish incompatible standards of

23                 conduct for Defendant;

24            (b)    The prosecution of separate actions by individual Class

25                 Members would create a risk of adjudications with respect to

26                 them that would, as a practical matter, be dispositive of the

27                 interests of other Class Members not parties to the

28                 adjudications, or substantially impair or impede their ability

1                 to protect their interests; and

2         (c)     Defendant has acted or refused to act on grounds generally

3                 applicable to the Class, thereby making appropriate final and

4                 injunctive relief with respect to the members of the class as a

5                 whole.

6 **FIRST CAUSE OF ACTION**

7 **(Violation of California's Consumer Legal Remedies Act,**

8 **California Civil Code § 1750, *et seq*.)**

9      70.     Plaintiff incorporates by reference the allegations contained in the

10 preceding paragraphs of this Complaint.

11      71.     Plaintiff brings this cause of action on behalf of herself and on

12 behalf of the members of the CLRA Sub-Class.

13      72.     Defendant is a "person" as defined by California Civil Code

14 § 1761(c).

15      73.     Plaintiff and CLRA Sub-class Members are "consumers" within the

16 meaning of California Civil Code § 1761(d) because they purchased their Class

17 Vehicles primarily for personal, family or household use.

18      74.     By failing to disclose and concealing the defective nature of the

19 coolant pumps from Plaintiff and prospective Class Members, Defendant

20 violated California Civil Code § 1770(a), as it represented that the Class

21 Vehicles and their coolant pumps had characteristics and benefits that they do

22 not have, and represented that the Class Vehicles and their coolant pumps were

23 of a particular standard, quality, or grade when they were of another. *See* Cal.

24 Civ. Code §§ 1770(a)(5) & (7).

25      75.     Defendant's unfair and deceptive acts or practices occurred

26 repeatedly in Defendant's trade or business, were capable of deceiving a

27 substantial portion of the purchasing public, and imposed a serious safety risk on

28 the public.

76. Defendant knew that the Class Vehicles and their coolant pumps suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

77. As a result of their reliance on Defendant's omissions and/or misrepresentations, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Coolant Pump Defect, Plaintiff and the Class Members were harmed and suffered actual damages in that the Class Vehicles' coolant pumps are substantially certain to fail before their expected useful life has run.

78. Defendant was under a duty to Plaintiff and the Class Members to disclose the defective nature of the coolant pumps and/or the associated repair costs because:

      (a)    Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles' coolant pumps;

      (b)    Plaintiff and the Class Members could not reasonably have been expected to learn or discover that their coolant pumps had a dangerous safety defect until it manifested; and

      (c)    Defendant knew that Plaintiff and the Class Members could not reasonably have been expected to learn of or discover the safety defect.

79. In failing to disclose the defective nature of the coolant pumps, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

80. The facts Defendant concealed from or did not disclose to Plaintiff and the Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the

1    Class Vehicles or pay less. Had Plaintiff and other Class Members known that
2    the Class Vehicles' coolant pumps were defective, they would not have
3    purchased or leased the Class Vehicles or would have paid less for them.

4        81.    Plaintiff and the Class Members are reasonable consumers who do
5    not expect the coolant pumps installed in their vehicles to cause sudden loss of
6    forward propulsion, loss of vehicle control, slowed steering, and complete
7    automobile failure. This is the reasonable and objective consumer expectation
8    relating to vehicle coolant pumps

9        82.    As a result of Defendant's conduct, Plaintiff and Class Members
10   were harmed and suffered actual damages in that the Class Vehicles experienced
11   and will continue to experience sudden losses of acceleration, inability to
12   maneuver the vehicle due to recessed speed and complete vehicle failure.

13       83.    As a direct and proximate result of Defendant's unfair or deceptive
14   acts or practices, Plaintiff and Class Members suffered and will continue to
15   suffer actual damages.

16       84.    Plaintiff and the Class are entitled to equitable relief.

17       85.    Plaintiff provided Defendant with notice of its violations of the
18   CLRA pursuant to California Civil Code § 1782(a). If, within 30 days,
19   Defendant fails to provide appropriate relief for their violations of the CLRA,
20   Plaintiff will amend this Complaint to seek monetary, compensatory, and
21   punitive damages, in addition to the injunctive and equitable relief that he seeks
22   now.

23                        **SECOND CAUSE OF ACTION**

24   **Violation of California Business & Professions Code § 17200, *et seq.***

25       86.    Plaintiff incorporates by reference the allegations contained in the
26   preceding paragraphs of this Complaint.

27       87.    Plaintiff brings this cause of action on behalf of herself and on
28   behalf of all Class Members, and in the alternative on behalf of the California

1 | Sub-Class.

2 |     88. As a result of their reliance on Defendant's omissions and/or
3 | misrepresentations, owners and/or lessees of the Class Vehicles suffered an
4 | ascertainable loss of money, property, and/or value of their Class Vehicles.
5 | Additionally, as a result of the Coolant Pump Defect, Plaintiff and the Class
6 | Members were harmed and suffered actual damages in that the Class Vehicles'
7 | coolant pumps are substantially certain to fail before their expected useful life
8 | has run.

9 |     89. California Business & Professions Code § 17200 prohibits acts of
10 | "unfair competition," including any "unlawful, unfair or fraudulent business act
11 | or practice" and "unfair, deceptive, untrue or misleading advertising."

12 |     90. Plaintiff and the Class Members are reasonable consumers who do
13 | not expect their coolant pumps to cause sudden losses of acceleration, inability to
14 | maneuver the vehicle due to recessed speed, slowed steering, and complete
15 | automobile failure.

16 |     91. Defendant knew the Class Vehicles and their coolant pumps
17 | suffered from inherent defects, were defectively designed or manufactured,
18 | would fail prematurely, and were not suitable for their intended use.

19 |     92. In failing to disclose the defects with the coolant pump, Defendant
20 | has knowingly and intentionally concealed material facts and breached its duty
21 | not to do so.

22 |     93. Defendant was under a duty to Plaintiff and the Class Members to
23 | disclose the defective nature of the Class Vehicles and their coolant pumps:

24 |         (a) Defendant was in a superior position to know the true state of
25 |             facts about the safety defect in the Class Vehicles' coolant
26 |             pumps;

27 |         (b) Defendant made partial disclosures about the quality of the
28 |             Class Vehicles without revealing the defective nature of the

1        Class Vehicles and their coolant pumps; and

2            (c)    Defendant actively concealed the defective nature of the Class

3                Vehicles and their coolant pumps from Plaintiff and the Class.

4        94.    The facts Defendant concealed from or failed to disclose to Plaintiff

5    and the Class Members are material in that a reasonable person would have

6    considered them to be important in deciding whether to purchase or lease Class

7    Vehicles. Had Plaintiff and other Class Members known that the Class Vehicles'

8    coolant pumps were defective and posed a safety hazard, then Plaintiff and the

9    other Class Members would not have purchased or leased Class Vehicles

10   equipped with coolant pumps, or would have paid less for them.

11       95.    Defendant continued to conceal the defective nature of the Class

12   Vehicles and their coolant pumps even after Class Members began to report

13   problems. Indeed, Defendant continues to cover up and conceal the true nature

14   of the problem.

15       96.    By its conduct, Defendant has engaged in unfair competition and

16   unfair business practices.

17       97.    Defendant's unfair acts or practices occurred repeatedly in

18   Defendant's trade or business and were capable of deceiving a substantial

19   portion of the purchasing public.

20       98.    In addition, as set forth herein, Defendant's acts and practices

21   alleged herein are unlawful because they violate California Civil Code §§ 1770

22   (a)(5), 1770 (a)(7), 1770 (a)(9), 1792, et seq., and 1795.90, et seq., and 15

23   U.S.C. § 2301, *et seq*.

24       99.    Further, as set forth herein, Defendant's acts and practices alleged

25   herein are deceptive in that they were capable of misleading or deceiving, and in

26   fact did mislead and deceive, a substantial portion of the purchasing public.

27       100.   As a direct and proximate result of Defendant's unfair, unlawful and

28   deceptive practices, Plaintiff and Class Members have suffered and will continue

1    to suffer actual damages.

2      101. Defendant has been unjustly enriched and should be required to

3    make restitution to Plaintiff and Class Members, pursuant to §§ 17203 and 17204

4    of the Business & Professions Code.

5                     **THIRD CAUSE OF ACTION**

6          **(Breach of Implied Warranty Pursuant to Song-Beverly**

7    **Consumer Warranty Act, California Civil Code §§ 1792 and 1791.1, *et seq*.)**

8      102. Plaintiff incorporates by reference the allegations contained in the

9    preceding paragraphs of this Complaint.

10      103. Plaintiff brings this cause of action against Defendant on behalf of

11    herself and on behalf of the members of the California Sub-Class.

12      104. Defendant was at all relevant times the manufacturer, distributor,

13    warrantor, and/or seller of the Class Vehicles. Defendant knew or had reason to

14    know of the specific use for which the Class Vehicles were purchased or leased.

15      105. Defendant provided Plaintiff and Class Members with an implied

16    warranty that the Class Vehicles and their components and parts are

17    merchantable and fit for the ordinary purposes for which they were sold.

18    However, the Class Vehicles are not fit for their ordinary purpose of providing

19    reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles

20    and their coolant pumps suffered from an inherent defect at the time of sale and

21    thereafter are not fit for their particular purpose of providing safe and reliable

22    transportation.

23      106. Defendant impliedly warranted that the Class Vehicles were of

24    merchantable quality and fit for such use. This implied warranty included,

25    among other things: (i) a warranty that the Class Vehicles and their coolant

26    pumps were manufactured, supplied, distributed, and/or sold by Ford were safe

27    and reliable for providing transportation; and (ii) a warranty that the Class

28    Vehicles and their coolant pumps would be fit for their intended use while the

1  Class Vehicles were being operated.

2      107.  Contrary to the applicable implied warranties, the Class Vehicles

3  and their coolant pumps at the time of sale and thereafter were not fit for their

4  ordinary and intended purpose of providing Plaintiff and the Class Members with

5  reliable, durable, and safe transportation. Instead, the Class Vehicles are

6  defective, including but not limited to the defective design and manufacture of

7  their coolant pumps.

8      108.  As a result of Defendant's breach of the applicable implied

9  warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable

10  loss of money, property, and/or value of their Class Vehicles. Additionally, as a

11  result of the Coolant Pump Defect, Plaintiff and the Class Members were harmed

12  and suffered actual damages in that the Class Vehicles' coolant pumps are

13  substantially certain to fail before their expected useful life has run.

14      109.  Defendant's actions, as complained of herein, breached the implied

15  warranty that the Class Vehicles were of merchantable quality and fit for such

16  use in violation of California Civil Code §§ 1792 and 1791.1.

17                 **FOURTH CAUSE OF ACTION**

18  **(Breach of Implied Warranty Pursuant to Magnuson-Moss Warranty Act**

19               **Pursuant to 15 U.S.C. § 2301)**

20      110.  Plaintiffs incorporate by reference each proceeding and succeeding

21  paragraph as applicable as though fully set forth at length herein.

22      111.  Plaintiffs and the other Class members are "consumers" within the

23  meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

24      112.  Defendant is a "supplier" and "warrantor" within the meaning of 15

25  U.S.C. § 2301(4)-(5).

26      113.  The Class Vehicles are "consumer products" within the meaning of

27  15 U.S.C. § 2301(1).

28      114.  Defendant impliedly warranted that the Class Vehicles were of

1    merchantable quality and fit for such use. This implied warranty included,
2    among other things: (i) a warranty that the Class Vehicles and their coolant
3    pumps were manufactured, supplied, distributed, and/or sold by Ford were safe
4    and reliable for providing transportation; and (ii) a warranty that the Class
5    Vehicles and their coolant systems would be fit for their intended use while the
6    Class Vehicles were being operated.

7    115. Contrary to the applicable implied warranties, the Class Vehicles
8    and their coolant pumps at the time of sale and thereafter were not fit for their
9    ordinary and intended purpose of providing Plaintiff and the Class Members with
10    reliable, durable, and safe transportation. Instead, the Class Vehicles are
11    defective, including but not limited to the defective design of their coolant
12    pumps.

13    116. The amount in controversy of the Plaintiffs' individual claims meets
14    or exceeds the sum or value of $25. In addition, the amount in controversy
15    meets or exceeds the sum or value of $50,000 (exclusive of interests and costs)
16    computed on the basis of all claims to be determined in this suit.

17    117. Defendant has been afforded a reasonable opportunity to cure its
18    breach of implied warranty, including when Class Members brought their
19    vehicles in for diagnoses and repair of the battery system.

20    **RELIEF REQUESTED**

21    118. Plaintiff, on behalf of herself, and all others similarly situated,
22    requests the Court to enter judgment against Defendant, as follows:

23        (a)    An order certifying the proposed Class and Sub-Classes,
24             designating Plaintiff as named representative of the Class, and
25             designating the undersigned as Class Counsel;

26        (b)    A declaration that Defendant is financially responsible for
27             notifying all Class Members about the defective nature of the
28             coolant pump, including the need for period maintenance;

(c)    An order enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles, and to remove and replace Plaintiff and Class Members' coolant pump with a suitable alternative product;

(d)    A declaration requiring Defendant to comply with the various provisions of the Song-Beverly Act alleged herein and to make all the required disclosures;

(d)    A declaration requiring Defendant to comply with the various provisions of the Magnuson-Moss Act alleged herein and to make all the required disclosures;

(e)    An award to Plaintiff and the Class for compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial, except at this time Plaintiff does not pray for any monetary damages as a result of Defendant's violation of the California Consumer Legal Remedies Act;

(f)    Any and all remedies provided pursuant to the Song-Beverly Act, including California Civil Code section 1794;

(g)    A declaration that Defendant must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale or lease of its Class Vehicles, or make full restitution to Plaintiff and Class Members;

(h)    An award of attorneys' fees and costs, as allowed by law;

(i)    An award of attorneys' fees and costs pursuant to California Code of Civil Procedure § 1021.5;

(j)    An award of pre-judgment and post-judgment interest, as provided by law;

(k)    Leave to amend the Complaint to conform to the evidence produced at trial; and

1            (I)     Such other relief as may be appropriate under the

2            circumstances.

3                         **DEMAND FOR JURY TRIAL**

4       119.  Pursuant to Federal Rule of Civil Procedure 38(b) and Central

5 District of California Local Rule 38-1, Plaintiff demands a trial by jury of any

6 and all issues in this action so triable.

7

8 Dated: June 28, 2013                  Respectfully submitted,

9                                 Capstone Law APC

10

11                         By:

12                              Jordan L. Darle
                             David L. Cheng
13                            Tarek H. Zohdy
                           Cody R. Padgett

14                         Attorneys for Plaintiff Jean MacDonald

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

1  Jordan L. Lurie (SBN 130013)
2  Jordan.Lurie@capstonelawyers.com
   David L. Cheng (SBN 240926)
3  David.Cheng@capstonelawyers.com
   Capstone Law APC
4  1840 Century Park East, Suite 450
   Los Angeles, California 90067
5  Telephone: (310) 556-4811
   Facsimile: (310) 943-0396
6
   Attorneys for Plaintiff
7  Jean MacDonald

8                    UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10

11  JEAN MACDONALD, individually,        Case No:
    and on behalf of other members of
12  the general public similarly situated,   **DECLARATION OF JEAN**
                                             **MACDONALD IN SUPPORT OF**
13              Plaintiff,                    **PLAINTIFF'S SELECTION OF**
                                             **VENUE FOR TRIAL OF CLAIMS**
14          vs.                              **ARISING UNDER THE**
                                             **CALIFORNIA CONSUMER LEGAL**
15  FORD MOTOR COMPANY,                     **REMEDIES ACT**

16              Defendant.
                                             [Cal. Civ. Code, § 1780, subd. (d)]
17

18

19

20

21

22

23

24

25

26

27

28

DECL. OF JEAN MACDONALD IN SUPPORT OF PLAINTIFF'S SELECTION OF VENUE FOR TRIAL

1

# DECLARATION OF JEAN MACDONALD

2     I, JEAN MACDONALD, declare under penalty of perjury as follows:

3     1.     I make this declaration based upon my personal knowledge except as
4  to those matters stated herein that are based upon information and belief, which I
5  believe to be true.  Unless the context indicates otherwise, I have personal
6  knowledge of the facts stated in this Declaration and if called as a witness, I could
7  and would competently testify thereto.  I am Plaintiff Jean MacDonald in the
8  above-captioned matter.

9     2.     Pursuant to California Civil Code section 1780(d), this Declaration is
10  submitted in support of Plaintiff's Selection of Venue for the Trial of Plaintiff's
11  Cause of Action alleging violation of California's Consumer Legal Remedies Act.

12     3.     I purchased my 2007 Ford Escape Hybrid, which is the vehicle at
13  issue in this action, in March of 2007, in Walnut Creek, California.

14     4.     On information and belief, Defendant Ford Motor Company is a
15  corporation organized and in existence under the laws of the State of Delaware,
16  and registered with the California Department of Corporations to conduct business
17  in California.  Defendant is engaged in the business of designing, manufacturing,
18  constructing, assembling, marketing, distributing, or selling automobiles and other
19  motor vehicles and motor vehicle components throughout the United States of
20  America, including Antioch, California.

21     5.     Based on the facts set forth herein, this Court is a proper venue for the
22  prosecution of Plaintiff's Cause of Action alleging violation of California's
23  Consumer Legal Remedies Act because Defendant conducts business activities in
24  the Northern District of California, including, but not limited to marketing,
25  distributing and/or selling Class Vehicles to Class Members.  In addition, the
26  transaction at issue, or a substantial portion thereof, occurred in the Northern
27  District of California.

28

1       I declare under penalty of perjury under the laws of the United States of

2   America and the State of California that the forgoing is true and correct. Executed

3   this 27th day of June, 2013 in Antioch , California.

4

5                       _Jean MacDonald_

6                       Jean MacDonald

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28