Jordan L. Lurie (SBN 130013)
Jordan.Lurie@capstonelawyers.com
Robert K. Friedl (SBN 134947)
Robert.Friedl@capstonelawyers.com
Tarek H. Zohdy (SBN 247775)
Tarek.Zohdy@capstonelawyers.com
Cody R. Padgett (SBN 275553)
Cody.Padgett@capstonelawyers.com
Capstone Law APC
1840 Century Park East, Suite 450
Los Angeles, California 90067
Telephone:  (310) 556-4811
Facsimile:   (310) 943-0396

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| JEAN MACDONALD, VERONICA H. AGUIRRE, AND BRIAN C. BARBEE, individually, and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>vs.<br><br>FORD MOTOR COMPANY,<br><br>Defendant. | Case No. 3:13-cv-02988-JST<br><br>**CLASS ACTION**<br><br>**NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES UNDER A CATALYST THEORY; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**[Declaration of Tarek H. Zohdy and attached Exhibits filed concurrently herewith]**<br><br>Judge:        Hon. John S. Tigar<br>Courtroom: 9, 19th Floor.<br>Date:         September 15, 2015<br>Time:         2:00 p.m. |

CASE NO 3:13-CV-02988-JST

NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES UNDER A CATALYST THEORY;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

**TO ALL PARTIES AND THEIR ATTORNEYS HEREIN:**

**PLEASE TAKE NOTICE** that on Thursday September 15, 2015 at 2:00 p.m., or so soon thereafter as the parties may be heard, in Courtroom 9 of the above entitled court, located at 450 Golden Gate Avenue, San Francisco, California, Plaintiffs Jean MacDonald, Veronica H. Aguirre and Brian C. Barbee will move this Court for an Order granting Plaintiffs' Motion for Attorneys' Fees Under a Catalyst Theory.

This Motion is made pursuant to Cal. Code of Civ. P. ("CCP") § 1021.5. Plaintiffs' respectfully request that this Court issue an Order granting Plaintiffs' Motion for Attorneys' Fees Under a Catalyst Theory.

This Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities in Support thereof, the Declaration of Tarek H. Zohdy and supporting evidence, and all other pleadings and papers on file in this action and such argument as may be presented to the Court at the time of the hearing.


Dated:  June 22, 2015                    Respectfully submitted,

                                        Capstone Law APC



                                    By:   /s/ Tarek H. Zohdy
                                        Jordan L. Lurie
                                        Robert K. Friedl
                                        Tarek H. Zohdy
                                        Cody R. Padgett

                                        *Attorneys for Plaintiffs*

1

**TABLE OF CONTENTS**

2

3   I.      INTRODUCTION AND OVERVIEW ...................................................... 1

4   II.     THE LEGAL STANDARD FOR A CATALYST FEE

5           AWARD............................................................................................... 3

6   III.    PLAINTIFFS' LAWSUIT WAS A CATALYST BASED ON

7           THE CHRONOLOGY OF EVENTS ................................................... 5

8           A.    Plaintiffs' CLRA Letter and Identification of Safety

9                 Defect ....................................................................................... 5

10          B.    Plaintiffs' Initial Complaint ................................................... 6

11          C.    Second Demand Letter ............................................................ 6

12          D.    Plaintiffs' First Amended Complaint ...................................... 7

13          E.    Plaintiffs' Second Amended Complaint and this Court's

14                Motion to Dismiss Order.......................................................... 8

15          F.    Initial Disclosures, Discovery, and Ford's Answer to

16                Plaintiffs' Second Amended Complaint .................................. 9

17          G.    The Parties' Joint Case Management Statements ................. 10

18          H.    Ford's Attempt to Scrub the Motion to Dismiss Order of

19                Any References to Safety Defect .......................................... 10

20          I.    Plaintiffs' Third Demand Letter ........................................... 10

21          J.    Ford's Recall ......................................................................... 10

22  IV.     FORD'S VERSION DOES NOT WITHSTAND SCRUTINY

23          AND IS UNDERMINED BY ITS OWN SUBMISSION TO

24          NHTSA ............................................................................................. 11

25  V.      THE REMAINING CATALYST REQUIREMENTS ARE

26          SATISFIED BASED ON FORD'S STIPULATION............................... 14

27  VI.     CONCLUSION ................................................................................... 15

28

NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES UNDER A CATALYST THEORY;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

1

# TABLE OF AUTHORITIES

2

3
**FEDERAL CASES**

4
*Henderson v. J.M. Smucker Company*,

5
    2013 U.S. Dist. LEXIS 87030 (C.D. Cal. 2013) ...................................... 1, 4, 5

6
*Tazel v. City of Richmond*, 2007 WL 172379 (2007) ........................................... 5

7

8
**STATE CASES**

9
*Beasley v. Wells Fargo Bank*, 235 Cal. App. 3d 1407 (1991) ............................ 15

10
*California for Responsible Toxic Management v. Kizer*,

11
    211 Cal. App. 3d 961 (1989)....................................................................... 2, 5

12
*Cates v. Chiang*, 213 Cal. App. 4th 791 (2013) ........................................... 4, 16

13
*Graham v. DaimlerChrysler Corp.*, 34 Cal. 4th 553 (2004)....................... *passim*

14
*Hogar v. Community Development Commission of the City of*

15
    *Escondido*, 157 Cal. App. 4th 1358 (2007).................................................. 4, 5

16
*Marine Forests Society v. California Coastal C*,

17
    160 Cal. App. 4th 867 (2008) ........................................................................ 5

18
*Tipton-Whittingham v. City of Los Angeles*, 34 Cal. 4th 604 (2004)............... 4, 5

19

20
**FEDERAL STATUTES**

21
49 U.S.C. § 3021(a)........................................................................................... 15

22

23
**STATE STATUTES**

24
Cal. Bus. & Prof. Code §§ 17200 *et seq*. (unfair Comp. Law (UCL))................. 2

25
Cal. Civ. Code §§ 1750 *et seq*. (Cons. Legal Remedies Act (CLRA)) ............. 2, 6

26
Cal. Civ. Proc. Code § 1021.5 ................................................................ *passim*

27

28

CASE NO 3:13-CV-02988-JST
NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES UNDER A CATALYST THEORY;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

# I.     INTRODUCTION AND OVERVIEW

Plaintiffs filed their initial complaint in this action on June 28, 2013 alleging a safety defect in the Motor Electronics Coolant Pump ("MECP") for 2005-2008 Ford Escape Hybrid and/or 2006-2008 Mercury Mariner Hybrid vehicles ("Class Vehicles").  Plaintiffs identified a defect in the MECP that can result in stalls while driving.  Fifteen (15) months later and following extensive litigation, on September 2, 2014, Ford notified NHTSA of its intent to perform a voluntary safety recall (Safety Recall 14S19 or the "Recall") of the Class Vehicles to address the exact defect in the MECP identified by Plaintiffs. Plaintiffs hereby move for an order that their lawsuit was a catalyst for the Recall.[1]

The chronology of events confirms that Plaintiffs' lawsuit was a catalyst for the Recall.  *See Henderson v. J.M. Smucker Company*, 2013 U.S. Dist. LEXIS 87030 at *10 (C.D. Cal. 2013) (citing *Graham v. DaimlerChrysler Corp.*, 34 Cal. 4th 553, 573 (2004) (the "sensible approach" is for the chronology of events to give rise to the inference that plaintiff's action was the cause; the burden then shifts to defendant to offer rebuttal).  To prevail on a catalyst theory, Plaintiffs do not have to prove that their lawsuit was the only cause for the Recall; they only have to prove that it was *a* significant cause.  *Graham*, 34 Cal. 4th at 577.  "If a plaintiff's lawsuit induced the defendant's response or was a material factor or contributed in a significant way to the result achieved, then the plaintiff has shown the necessary causal connection." *California for Responsible Toxic Management v. Kizer*, 211 Cal. App. 3d 961, 967 (1989).  Plaintiffs have

---

[1] The parties have stipulated that "the only issue to be determined going forward is Plaintiffs' entitlement to fees under a catalyst theory for prompting the Recall."  Dkt. No. 56.  The Court also has approved the parties' request to bifurcate the proceedings related to Plaintiffs' catalyst fee motion.  The first stage will determine whether Plaintiffs are entitled to recover attorneys' fees under a catalyst theory. The second stage will determine the amount of fees to be awarded. Dkt. No. 64.

1   satisfied that standard.

2   It is undisputed that Ford issued the Recall a year and three months *after*

3   Plaintiffs initiated this action, *after* Plaintiffs twice amended their complaint,

4   *after* Ford twice moved to dismiss Plaintiffs' complaint, *after* Ford answered

5   Plaintiffs' complaint, *after* the Parties exchanged Initial Disclosures and

6   discovery responses; and *after* Plaintiffs sent Ford multiple settlement demands

7   to remedy the MECP defect.  Ford presumably sufficiently investigated

8   Plaintiffs' claims because at every opportunity, Ford continued to deny that

9   Plaintiffs' claims had merit and that the MECP problem was a safety issue.  All

10  of this activity occurred *prior* to the Recall.  Then, in September 2014, Ford

11  suddenly announced the Recall – which consists of the same relief Plaintiffs had

12  been seeking – and now has the temerity to claim Plaintiffs' lawsuit had no

13  effect on Ford's decision.

14  A set forth below, the evidence shows that it was only *after* this Court's

15  March 31, 2014 Order on Ford's motion to dismiss Plaintiffs' Second Amended

16  Complaint [Dkt . No. 43] sustaining Plaintiffs' fraud based causes of action –

17  CLRA and UCL – that Ford opened a formal investigation into the MECP defect

18  in April 2014.  The motion to dismiss order confirmed Plaintiffs' allegations that

19  MECP problem was a "safety" defect; a fact that Ford did not dispute.  It was

20  that Order, resulting from this litigation, that prompted Ford to take action.  Once

21  this Court affirmed that the MECP problem was safety related, Ford had no

22  choice but to finally act.  Ford's own chronology of events submitted to NHTSA

23  in connection with the Recall further confirms that the information that Ford

24  relied on to Recall the Class Vehicles already had been identified earlier by

25  Plaintiffs' in this lawsuit.

26  Predictably, Ford contends that Plaintiffs' lawsuit "played no role in

27  Ford's decision" to issue the vehicle Recall in this action.  *See* "Ford's Position

28  on Catalyst Fees," Joint Case Management at 5 [Dkt. No. 56].  Ford's argument

appears to be that Plaintiffs' lawsuit did not provide any more information than Ford already had based on its own prior investigation of the MECP in 2009 and that it was an email inquiry from an employee at a Canadian governmental agency, Transport Canada, and not Plaintiffs' lawsuit, that triggered the analysis and investigation that led to the Recall.

Respectfully, Ford's position is a story contrived after the fact, strains credulity and is demonstrably false.  Further, conveniently, neither Kenneth Lilly (who is the person at the center of the MECP investigation and designated by Ford as most knowledgeable regarding Plaintiffs' lawsuit and the MECP defect), nor the Canadian inquiry, were even identified in Ford's Initial Disclosures or discovery responses.

Moreover, if Ford is correct that Plaintiffs' complaint and subsequent litigation had no effect on Ford, Ford has bigger problems than just Plaintiffs' catalyst motion.  It would appear that, like General Motors and the ignition switch debacle, Ford did not take Plaintiffs' claims seriously, even though Plaintiffs' lawsuit repeatedly called to Ford's attention a critical safety issue that ultimately resulted in the Recall.  This points to an even more fundamental breakdown on the part of Ford.  Ford either has to admit that Plaintiffs' lawsuit played a role in the Recall or has to admit that, for nearly a year, Ford did nothing in response to being notified by Plaintiffs that the MECP posed a serious safety concern.

## II.     THE LEGAL STANDARD FOR A CATALYST FEE AWARD

A party seeking an award of attorneys' fees under CCP section 1021.5 must be a "successful party."  Courts in the Ninth Circuit have endorsed the California Supreme Court's determination that a party may be entitled to section 1021.5 attorneys' fees under a "catalyst theory."  *See, e.g.*, *Henderson, supra,* 2013 U.S. Dist. LEXIS 87030 at *6 (citing *Graham v. DaimlerChrysler Corp.*, 34 Cal. 4th 553 (2004) and *Tipton-Whittingham v. City of Los Angeles*, 34 Cal.

4th 604, 608 (2004) ("California law continues to recognize the catalyst theory and does not require a 'judicially recognized change in the legal relationship between the parties' [such as a judgment on the merits, a consent decree or a judicially ordered settlement] as a prerequisite for obtaining attorneys' fees under Code of Civil Procedure section 1021.5."). *See also Cates v. Chiang*, 213 Cal. App. 4th 791 (2013); *Hogar v. Community Development Commission of the City of Escondido*, 157 Cal. App. 4th 1358 (2007).

To obtain an award of attorneys' fees on a catalyst theory, "a plaintiff must establish that (1) the lawsuit was a catalyst motivating the defendants to provide the primary relief sought; (2) the lawsuit had merit and achieved its catalytic effect by threat of victory, not by dint of nuisance and threat of expense, as elaborated in *Graham*; and (3) plaintiffs reasonably attempted to settle the litigation prior to filing the lawsuit." *Tipton-Whittingham,* 34 Cal. 4th at 608. *See also Graham*, 34 Cal. 4th at 567, 575, 577; *Hogar*, 157 Cal. App. 4th at 1365. Importantly, the catalyst theory does not require that plaintiffs' lawsuit be the *only* cause of defendants' acquiescence. "Rather, the litigation need only be a substantial factor contributing to the defendant's action." *Graham*, 34 Cal. 4th at 577. "If a plaintiff's lawsuit induced the defendant's response or was a material factor or contributed in a significant way to the result achieved, then the plaintiff has shown the necessary causal connection." *California for Responsible Toxic Management v. Kizer*, 211 Cal. App. 3d 961, 967 (1989). *See also Tipton-Whittingham,* 34 Cal. 4th at 607 (a lawsuit is a catalyst where the Plaintiff "activates" the defendant to modify its behavior). S*ee also Tazel v. City of Richmond*, 2007 WL 172379, at *12 ( 2007) ("A defendant's voluntary action induced by plaintiff's lawsuit will still support an attorney fee award on the rationale that the lawsuit spurred defendant to act or was a catalyst for speeding defendants' response."). *See also Marine Forests Society v. California Coastal C*, 160 Cal. App. 4th 867, 877 (2008) (a plaintiff is considered a "successful

party" entitled to attorneys' fees under section 1021.5 "if the defendant changes its behavior substantially because of, and in the manner sought by, the litigation").

"Obviously, it can be difficult to prove causation where, as here plaintiff seeks to recover on a catalyst theory.  When action is taken by defendant after plaintiff's lawsuit is filed, the chronology of events may permit the inference that the two events are causally related."  *California for Responsible Toxic Management, supra,* 211 Cal. App. 3d at 961.  *See also Henderson*, 2013 WL 3146774 at *10 ("the sensible approach. . . is to allow the chronology of events to give rise to the inference that the lawsuit . . .and the actions taken by [defendant] are causally related and such inference [then] shifts the burden to defendant to offer rebuttal.").  "The appropriate benchmarks in determining which party prevailed are (a) the situation immediately prior to the commencement of the lawsuit (b) the situation today, and the role if any played by the litigation in effecting any changes between the two."  *Hogar, 1*57 Cal. App. 4th at 1367.

## III.   PLAINTIFFS' LAWSUIT WAS A CATALYST BASED ON THE CHRONOLOGY OF EVENTS

Based on the following chronology, Ford was well aware of Plaintiffs' lawsuit prior to the Recall, and Plaintiffs' action repeatedly put Ford on notice of the safety concerns regarding the MECP defect.  The chronology also confirms that, prior to this Motion, Ford failed to tell Plaintiffs or the Court anything about the Canadian inquiry that supposedly was responsible for the Recall or who Kenneth Lilly is.

### A.   Plaintiffs' CLRA Letter and Identification of Safety Defect

On June 25, 2013, before the lawsuit was filed, Plaintiffs served Ford with a pre-litigation settlement demand pursuant to the CLRA.  *See* Declaration of Tarek Zohdy in Support of Plaintiffs' Motion for Attorneys' Fees Under a

1   Catalyst Theory ("Zohdy Decl.") Ex. 1.  The letter informed Ford of safety issue

2   and demanded that Ford provide a class-wide remedy.

3   **B.      Plaintiffs' Initial Complaint**

4   Plaintiffs' first complaint was filed on June 28, 2013.  The complaint

5   alleged defects in the Motor Electronics Coolant Pump in 2005-2008 Ford

6   Escape and Mercury Mariner hybrid vehicles.  In their complaint Plaintiffs

7   specifically identified Ford's knowledge of the existing defect, Ford's failure to

8   disclose the defect to purchasers, and that the defect was a safety hazard.  The

9   complaint was served on Defendant on July 2, 2013.  David George, of Dykema

10  Gosset PLLC, contacted Plaintiffs' counsel on July 15, 2013 informing Plaintiffs

11  that his firm had been retained by Ford Motor Company for purposes of

12  Plaintiffs' case and requesting an extension for Ford to respond to Plaintiffs'

13  initial complaint.  Zohdy Decl. Ex. 2.  The Parties filed a stipulation granting

14  Ford Motor Company a thirty (30) day extension to respond to Plaintiffs'

15  complaint on July 23, 2013.  [Dkt. No. 6].  Thereafter, Ford Motor Company

16  filed their declination to proceed before a magistrate judge August 16, 2013

17  [Dkt. No.16] and the case was assigned to the Honorable Judge Jon S. Tigar on

18  August 19, 2013.  [Dkt. No. 14].

19  After meeting and conferring, the Parties filed a stipulation on August 29,

20  2013 for Plaintiffs' to file a First Amended Complaint on September 5, 2013 in

21  lieu of Ford filing a motion to dismiss Plaintiffs' original complaint.  [Dkt.

22  No.16].  In other words, Ford is hard-pressed to argue that it  had no knowledge

23  of Plaintiffs' lawsuit.  Ford apparently had enough knowledge to hire outside

24  counsel, approve and file various stipulations, and determine to not proceed

25  before a magistrate.

26  **C.      Second Demand Letter**

27  Prior to filing their First Amended Complaint, on July 18, 2013, Plaintiffs

28  sent Ford a second formal demand letter requesting that Ford remedy the alleged

NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES UNDER A CATALYST THEORY;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

defect.  Zohdy Decl. Ex. 3.  The letter again identified the MECP problem as a safety defect. Even though Ford was represented by counsel at that point, Ford's counsel instructed Plaintiffs to send the letter directly to Ford while carbon copying him.  Zohdy Decl. Ex. 4.  Ford has at this point received two formal demand letters in two months identifying a safety defect and requesting a corrective remedy.

### D.    Plaintiffs' First Amended Complaint

Plaintiffs' First Amended Complaint was filed on September 5, 2013. [Dkt. No. 17].  Thereafter, on September 19, 2013, Ford filed its motion to dismiss Plaintiffs' First Amended Complaint. [Dkt. No. 19].  In its motion, Ford specifically did not dispute that the defect alleged by Plaintiffs was a safety hazard.  [Dkt. No. 19 at 12, ln. 13-14].  Ford's arguments were essentially that Plaintiffs' implied warranties had expired at the time Plaintiffs first experienced the alleged defect and that Plaintiffs had failed to meet their burden in alleging that Ford had pre-sale knowledge of the allege defect.  [Dkt. No. 19].  In support of its motion to dismiss, Ford filed the declaration of Mark Taylor, a Design Analysis Engineer for Ford Motor Company employed at Ford for twenty-five (25) years.  This declaration proves that a Ford senior Design Analysis Engineer was aware of Plaintiffs' allegations and was actively involved in Ford's attempt to dismiss Plaintiffs' case a year before any recall is announced.

After evaluating Ford's motion, Plaintiffs decided to file a Second Amended Complaint.  Thereafter, Plaintiffs' met and conferred with Ford's counsel, who discussed Plaintiffs' request with Ford and received consent from ford for Plaintiffs to file a Second Amended Complaint.  Plaintiffs provided Ford a redlined and final version of their Second Amended Complaint for review before it was filed.  Zohdy Decl. Ex. 5.  The Parties filed a stipulation permitting Plaintiffs to file a Second Amended Complaint on October 15, 2013.  [Dkt. No. 24].

E.      **Plaintiffs' Second Amended Complaint and this Court's Motion to Dismiss Order**

On October 24, 2013 Plaintiffs filed their Second Amended Complaint. [Dkt. No. 27].  Thereafter, on November 14, 2013 Ford filed its motion to dismiss Plaintiffs' Second Amended Complaint.  [Dkt. No. 28].  Along with its motion, Ford again filed a declaration of Mark Taylor.  In its motion, Ford again did not dispute that the alleged defect created a safety hazard, but instead again attacked Plaintiffs' pre-sale knowledge allegations.  In other words, in both Motions to Dismiss Plaintiffs' complaints, Ford did not – and could not-- dispute that the defect alleged by Plaintiffs created a safety hazard.  These confirmations came on September 19, 2013 and November 14, 2013, months *before* Ford now argues that it "discovered" there may be a safety issue.

On March 31, 2014, the Court issued its Order granting in part and denying in part Ford's motion to dismiss Plaintiffs' Second Amended Complaint. [Dkt. No. 43].  In its Order, the Court expressly confirmed that Ford did not dispute that the alleged defect was a material safety hazard.  "Ford does not dispute that the alleged defect is a material safety hazard. . . ." *Id.* at 5:6-7.  It was not until *after* the Court issued its Order that Ford contends it determined that an investigation was warranted.  In fact, according to Ford's own notice to NHTSA, Ford  began looking into the MECP defect identified by Plaintiffs in June of 2013 as a possible safety issue in April of 2014, right *after* the Court issued its March 31, 2014 order, and *after* Ford *twice* admitted that the issue may cause a safety issue.  As set forth below, Ford was so concerned about the Order and the confirmation of the safety defect allegations that Ford attempted to remove those allegations from the Order.  Zohdy Decl. ¶2.

Ford filed its answer to Plaintiffs' Second Amended Complaint on May 6, 2014 and the Parties commenced discovery.

**F.    Initial Disclosures, Discovery, and Ford's Answer to Plaintiffs' Second Amended Complaint**

On April 16, 2014, after the Court issued is Order on Ford's motion, the Parties exchanged initial disclosures.  In its initial disclosure, Ford did not identify any analysis or investigation it had opened regarding the defect alleged in Plaintiffs' complaint.  Ford also did not identify Kenneth Lilly as an individual having relevant information regarding an analysis opened by Ford in response to an email from Transport Canada regarding the Canadian versions of the Class Vehicles.  Further, Ford did not even identify any inquiry, correspondence or other communication whatsoever with Transport Canada that was relevant to Plaintiffs' case. Zohdy Decl. Ex. 6.  These lacunae are fatal to Ford's version of the story, as described below.  If, in fact, Ford already had been investigating the MECP defect in response to a Canadian inquiry and Ken Lilly was actively involved on behalf of Ford, why weren't these facts disclosed to Plaintiffs in Ford's Initial Disclosures?

On May 6, 2014, Ford filed its Answer to Plaintiffs' complaint.  In its Answer, Ford denied all allegations that a defect exists or that Ford knew of the defect [Dkt. No. 47], even though by that time the MECP issue had reached Ford's Critical Concern Review Group for evaluation.  Still, Ford did not inform Plaintiffs regarding any analysis or investigation opened for a possible defect nor did Ford identify any inquiry, correspondence or other communication with Transport Canada.

On July 9, 2014, Ford served its responses to Plaintiffs' First Set of Interrogatories and Requests for Production. Zohdy Decl. Ex. 7.  In its responses, Ford again denied that any defect exists, did not identify any inquiry, correspondence or other communication with Transport Canada; did not identify Kenneth Lilly in any of its discovery responses or as an individual with relevant information; and did not identify any analysis or investigation that was

concurrently opened to address the defect alleged in Plaintiffs' complaint.

### G.    The Parties' Joint Case Management Statements

The Parties filed two Joint Case Management Statements on March 20, 2014 and May 7, 2014.  [Dkt. Nos. 41 and 48].  In both Statements, Ford denied the existence of any defect and did not disclose that any investigation was under way.  Further, Ford failed to identify any inquiry, correspondence or other communication from Transport Canada and did not identify Mr. Kenneth Lilly as an individual with relevant information or that any analysis or investigation had been opened into the defect alleged by Plaintiffs.

### H.    Ford's Attempt to Scrub the Motion to Dismiss Order of Any References to Safety Defect

On or around July 8, 2014, Ford's counsel contacted Plaintiffs' counsel in an attempt to obtain Plaintiffs' agreement to amend the Court's Order on Ford's motion to dismiss.  Zohdy Decl. ¶2.  Ford requested that Plaintiffs' stipulate to amend the order to remove reference to Ford's non-dispute that the alleged defect posed a safety hazard.  The parties did not ultimately reach an agreement or enter into any stipulation in response to the request.

### I.    Plaintiffs' Third Demand Letter

On July 10, 2014, Plaintiffs sent Ford a third settlement demand letter.  In that letter Plaintiffs again requested that Ford address the alleged defect so that the vehicles no longer dangerously stall when the alleged defect exhibits itself.  Zohdy Decl. Ex. 8.  Ford never responded to Plaintiffs' demand.

### J.    Ford's Recall

On September 2, 2014, after over a year of litigation and after Plaintiffs' repeated requests to resolve this matter, Ford notified NHTSA of its intent to perform a safety recall (Recall No. 14V-526) to address the exact defect in the putative class vehicles.  Zohdy Decl. Ex 9.  Pursuant to the Recall, Ford has admitted that the defect poses a safety hazard to drivers and fellow road-goers

because the defect "can result in a sudden stall-like condition while driving.  An engine stall without warning while driving may increase the risk of a crash." Ford pinpointed the defect to motor brushes that experience premature wear which thereby causes the MECP to overheat leading to a "Failure Mode Effects Management" strategy which causes the vehicle to exhibit sudden stall-like conditions.  Ford will remedy this condition by a free of charge replacement of the MECP with a new improved brushless MECP and reimbursement of out of pocket repairs for the MECP Defect prior to the date of the safety recall notification.

In short, Ford issued the Recall a year and three months *after* Plaintiffs' initiated this action, *after* Plaintiffs twice amended their complaint, *after* Ford twice moved to dismiss Plaintiffs' complaint, *after* Ford answered Plaintiffs' complaint, *after* propounding discovery responses, and *after* Plaintiffs sent Ford multiple settlement demands to remedy the defect, and *after* repeatedly denying that any defect exists.

## IV.   FORD'S VERSION DOES NOT WITHSTAND SCRUTINY AND IS UNDERMINED BY ITS OWN SUBMISSION TO NHTSA

In order for Ford's position to have any merit, Ford would have had to completely ignore and trivialize Plaintiffs' efforts and the safety defect concerns that Plaintiffs repeatedly brought to Ford's attention and ignore the entire course of this litigation, including this Court's own motion to dismiss ruling.

Ford's own chronology in its notice to NHTSA in connection with the Recall (Zohdy Decl., Ex.9) confirms that the information that Ford relied on to Recall the Class Vehicles already had been identified earlier by Plaintiffs' in this lawsuit.  Ford identified the following relevant dates in its chronology:

(1) April 2014: Ford identified reports related to driveability issues, instrument cluster messages instructing drive to vehicle, and loss of power.

(2) May 2014: This issue was opened in Ford's Critical Concern Review

1   Group (CCRG) for analysis.

2       (3) June – August 2014: Ford continued to review field data to understand

3   the cause of the driveability and loss of power reports.  It was found that the

4   variability in the material used for brushes inside the Motor Electronics Coolant

5   Pump could result in an elevated and increasing rate of pump failure.  It was

6   found that certain pumps containing the potentially suspect brushes could fail

7   prematurely after many years in service.

8       (4) August 25, 2014:  Ford's Field Review Committee Reviewed the

9   concern and approved a field action.

10  *Id.*

11      This chronology is telling.  Most glaringly, there is no reference to any

12  Transport Canada inquiry.  Similarly, Ford's own internal documents that

13  describe the facts leading up to the Recall contain no reference at all to a

14  Transport Canada inquiry.  Zohdy Decl. Ex. 10.  In fact, this communication

15  with Transport Canada was not identified to Plaintiffs or at all until after Ford

16  issued the Recall and only after a convenient excuse was needed in order to

17  avoid Plaintiffs' catalyst fee arguments.

18      Further, the Transport Canada communication came in February of 2014

19  and by Ford's own admission, no analysis or investigation was opened until

20  *April of 2014*.  If the Transport Canada correspondence was so important to

21  Ford's ultimate issuance of a Recall, then why did Ford wait two months -- and

22  until after it lost on its second motion to dismiss, to open an analysis?  Further, if

23  the Transport Canada communication was so essential to Ford, why did Ford not

24  identify it in any of its discovery responses, in its initial disclosures, or in any of

25  the Parties' joint filings until the catalyst fee issue arose?

26      Next, Ford claims that in *April of 2014* it "identified reports related to

27  driveability issues, instrument cluster messages instructing driver to stop the

28  vehicle, and loss of power."  However, these very reports are found throughout

NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES UNDER A CATALYST THEORY;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

1    Plaintiffs' *three prior* complaints, going as far back as *June of 2013*. Not

2    coincidentally, April of 2014, when Ford claims to have initiated its

3    investigation, is directly *after* Plaintiffs' Second Amended Complaint was

4    sustained by the Court, and the Court identified the MECP defect as a safety

5    concern. April 2014 is also when Ford submitted its Initial Disclosures to

6    Plaintiffs in this case. But, the Initial Disclosures failed to even mention any

7    Canadian inquiry, even though the Disclosures were served two months *after* the

8    alleged Canadian inquiry was made.

9        Ford also told NHTSA that in May of 2014 "[t]his issue was opened in

10   Ford's Critical Concern Review Group (CCRG) for analysis." However, May of

11   2014 is when Ford filed its Answer to Plaintiffs' sustained Second Amended

12   Complaint in which it again *denied* that any defect exits. In June of 2014

13   (through August of 2014) Ford "continued to review the field data" to analyse

14   the defect and ultimately approving the recall on August 25, 2014. Again not

15   coincidentally, June of 2014 was when Plaintiffs sent Ford another settlement

16   demand letter specifically addressing the MECP defect.

17       Finally, Ford's chronology makes it appear as if the MECP issue was

18   something new that Ford had recently discovered. However, Ford's own

19   representations to this Court state that "there is no claim that Plaintiffs'

20   complaint told Ford anything it did not already know about the alleged MECS

21   defect." [Dkt. No. 56 at 6: 7-8]. That is not entirely true. While Ford was aware

22   of the problem since 2009, Ford did not decide to do anything about it until after

23   Plaintiffs' lawsuit highlighted that the MECP posed a serious safety defect. As a

24   result of Plaintiffs' lawsuit Ford had no choice but to admit that there may be a

25   safety defect present. Once it was confirmed that a safety defect existed, Ford

26   had to find a way to avoid crediting Plaintiffs for being a catalyst for the Recall.

27   So, Ford pegged the Recall to an email inquiry from Transport Canada. It was

28   the only fact that Ford could hang its hat on that pre-dated Ford's loss on its

NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES UNDER A CATALYST THEORY;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

1   motion to dismiss.

2   **V.    THE REMAINING CATALYST REQUIREMENTS ARE**

3   **SATISIFED BASED ON FORD'S STIPULATION**

4          In addition to the elements necessary to establish a catalyst theory for fees

5   under CCP 1021.5, Plaintiff must also show that the action "resulted in the

6   enforcement of an important right" and that a "significant benefit" on the general

7   public or large class of persons has been conferred.  *See, e.g., Graham*, 34 Cal.

8   4th at 578.[2]  A plaintiff seeking attorneys' fees under a catalyst theory also "must

9   first reasonably attempt to settle the matter short of litigation."  *Graham*, 34 Cal.

10  4th at 577 ("Lengthy prelitigation negotiations are not required, nor is it

11  necessary that the settlement demand be made by counsel, but a plaintiff must at

12  least notify the defendant of its grievances and proposed remedies and give

13  defendant the opportunity to meet its demands within a reasonable time.").

14         Ford has stipulated to the foregoing prerequisites. Specifically, in order to

15  avoid a deposition and further litigation on these issues, Ford has entered into a

16  stipulation entitled "Stipulation to Limit Issues in Dispute Regarding Plaintiffs'

17  Motion for Entitlement of Catalyst Fees").  Zohdy Decl. Attachment Ex. 12.

18  Ford has stipulated that:

19                   1.    Irrespective of any pre-litigation demand, Ford

20                   would not have agreed to settle this matter on a class-

21                   wide basis, including any safety-related recall or other

22                   class-wide relief and therefore any pre-litigation

23

---

24         [2] Under CCP 1021.5, the Court awards attorneys' fees to (1) a successful
25  party in a litigation (2) that has resulted in the enforcement of an important right
    affecting the public interest (3) if a significant benefit has been conferred on the
26  general public or a large class of persons, and (4) the necessity and financial
    burden of private enforcement are such to make the award appropriate.  As set
27  forth herein, Ford has stipulated that the Recall, which Plaintiffs' contend was
    the result of Plaintiffs' action, resulted in the enforcement of an important right
28  affecting the public interest and that a significant benefit has been conferred on
    the general public or a large class of persons.

demand would have been futile;

   2.    The right to have a defect related to motor
vehicle safety repaired pursuant to 49 U.S.C. § 3021(a)
is an important right affecting the public interest; and

   3.    Ford's Safety Recall 14S19 conferred a
significant benefit on the general public or a large class
of persons.

Even without the stipulation, there is little doubt that the lawsuit and
resultant Recall "conferred a significant benefit on the general public or a large
class of persons" and that private enforcement was necessary, as required by §
1021.5.  It is well settled that attorneys' fees under § 1021.5 may be awarded for
consumer class actions benefiting a large number of people.  *See, e.g., Beasley v.
Wells Fargo Bank*, 235 Cal. App. 3d 1407, 1417-18 (1991).  Similarly, based on
Ford's conduct to date, it is evident that pre-litigation attempt to settle would
have been futile.  An insufficient prelitigation attempt at settlement will not
preclude attorneys' fees under a catalyst motion when a prelitigation demand
would have been futile.  *Cates*, 213 Cal. App. 4th at 817.

## VI.   CONCLUSION

For all of the foregoing reasons, Plaintiffs' motion for entitlement to
attorneys' fee under a catalyst theory should be granted.

Dated:  June 22, 2015                Respectfully submitted,

                                     Capstone Law APC


                                     By:   /s/ Tarek H. Zohdy
                                     Jordan L. Lurie
                                     Robert K. Friedl
                                     Tarek H. Zohdy
                                     Cody R. Padgett

                                     *Attorneys for Plaintiffs*

NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES UNDER A CATALYST THEORY;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF