UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEAN MACDONALD, et al.,<br><br>   Plaintiffs,<br><br>  v.<br><br>FORD MOTOR COMPANY,<br><br>   Defendant. | Case No. 13-cv-02988-JST<br><br>**ORDER GRANTING PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**<br><br>Re: ECF No. 69 |

Before the Court is Plaintiffs' Motion for Attorneys' Fees. ECF No. 69. For the reasons set forth below, the Court will grant the motion.

## I.  BACKGROUND

### A.  Parties and Claims

Plaintiffs Jean MacDonald, Veronica Aguirre, and Brian Barbee bring this putative class action on behalf of individuals who purchased or leased 2005–2008 Ford Escape Hybrid vehicles and/or 2006–2008 Mercury Mariner Hybrid vehicles ("Class Vehicles"). ECF No. 27. Plaintiffs allege that Class Vehicles equipped with the Motor Electronic Cooling System ("MECS") contain defective coolant pumps. Plaintiffs allege that the defect caused abrupt loss of power, often at highway speeds, and consequently presented a safety risk to drivers. ECF No. 27 ¶ 5. Plaintiffs further allege that Defendant Ford Motor Company knew or should have known about the defect and failed to inform consumers. Id. ¶ 15.

### B.  Chronology of the Case

#### 1.  Demand Letters, Complaints, and Motions to Dismiss

On June 23, 2013, prior to filing the lawsuit, Plaintiffs served Ford with a pre-litigation demand letter pursuant to the California Legal Remedies Act ("CLRA"). ECF No. 69 at 5. Plaintiffs filed their complaint five days later on June 28, 2013. ECF No. 1. Plaintiffs served a

second formal demand letter requesting that Ford remedy the alleged defect on July 18, 2013. ECF No. 69-4.  Plaintiffs then filed a first amended complaint on September 5, 2013.  ECF No. 17.  On September 19, 2013, Ford filed a motion to dismiss.  ECF No. 19.  After meeting and conferring with Ford, Plaintiffs filed a second amended complaint on October 24, 2013.  ECF Nos. 24, 27.  Ford then filed a motion to dismiss Plaintiffs' second amended complaint on November 14, 2013.  ECF No. 28.

On March 31, 2014, the Court granted in part and denied in part Ford's motion to dismiss Plaintiffs' second amended complaint.  ECF No. 43.  The Court dismissed Plaintiffs' claims under the Song-Beverly and Magnuson-Moss Warranty Acts, but left intact Plaintiffs' remaining CLRA and California Unfair Competition Law ("UCL") claims.  Id.

On May 6, 2014, Ford filed an answer to Plaintiffs' second amended complaint and the Parties commenced discovery.  ECF No. 47.  On July 10, 2014, Plaintiffs sent Ford a third settlement demand letter.  ECF No. 69 at 10.

### 2. Ford's Internal Activity Regarding the MECS Defect

Much of Ford's evidence in opposition to this motion comes from Kenneth Lilly, an Early Warning Data Trend Specialist in Ford's Automotive Safety Office ("ASO").  Lilly first became aware of the stalling problem with the Class Vehicles in 2009, when he first began to look at data related to the MEC and trends in that data.  ECF No. 88-2 at 143.  Specifically, Lilly looked at the number of paid warranty claims per vehicle sold to determine whether rates of complaint were unusually high.  Id. at 143–44.  He determined at that time that the Ford Escape had an above average stall rate.  Id. at 147–48.  But he took no action.

In February 2014, Transport Canada[1] contacted an employee of Ford's Canadian subsidiary regarding a stalling complaint for one of the Class Vehicles.  See ECF No. 71-6, Ex. D. The Transport Canada field investigator described an incident where a 2008 Ford Escape Hybrid failed to accelerate while leaving a parking lot and then stopped.  Id.  Transport Canada also sent

---

[1] Transport Canada is the department within the government of Canada that is responsible for developing transportation regulations, policies, and programs.  For purposes of this order, it is analogous to the National Highway Traffic Safety Administration ("NHTSA").

1  the Ford employee copies of complaints made to the NHTSA that described similar stalling with
2  Ford Escape Hybrids.  Id.  The information from Transport Canada then "made its way" to Ford's
3  ASO, and then to Lilly.[2]  ECF No. 71-2 at 10.
4      Although Ford received the notice from Transport Canada in February 2014, Lilly did not
5  look into the MECP issue until late April 2014 because of his workload.  ECF No. 71-4, Ex. B,
6  Lilly Dep. 170:4–11; 184:20–23.  When he finally looked at the stalling issue, he used a different
7  strategy to review the data for the Escape Hybrid because, based on assessments he had done on
8  other warranty topics, Lilly now knew that dealers made coding errors.  Id. at 134:7–135:12.  To
9  correct for these errors, Lilly looked at the part numbers identified in the warranty claims.
10 According to Ford, this new way of reviewing the data caused Lilly to realize the stalling issue
11 was more rampant than Ford had previously believed.  Id. at 170:12–171:16.  Based on this fact
12 alone – because he was unaware of the present lawsuit – Lilly reported the stalling issue to Ford's
13 Critical Concern Review Group.  Id. at 171:13–172:6.
14     Ford contends that its personnel then "reviewed additional data and developed an action
15 plan."  ECF No. 71-2 at 11.  Ford, however, does not identify the data or detail the contents of the
16 plan.  On August 15, 2014, Ford's Technical Review Group recommended a safety recall to
17 replace the MECP and on August 25, 2014, Ford's Field Review Committee approved the recall.
18 Id.  The person or people who actually made the recall decision, whoever they were, did not
19 provide testimony.
20     **3.**    **Discovery**
21     The Parties exchanged initial disclosures on April 16, 2014.  ECF No. 48 at 6.  Ford did
22 not disclose the existence of any analysis or investigation regarding the alleged defect.  ECF No.
23 69 at 9.  Ford did not identify Kenneth Lilly or disclose Ford's correspondence with Transport
24 Canada, regarding that agency's inquiry about a stalling complaint.  ECF No. 69 at 9.  Ford now
25 contends it did not need disclose this information regarding the alleged defect because the

---

[2] Ford notes that, ordinarily, Plaintiffs' complaints would have been forwarded to the ASO for review.  See ECF No. 71-2 at 9.  However, Ford argues that "Plaintiffs' various complaints provided no information that was not already known to Ford based on ASO's review of warranty data, complaints to NHTSA, complaints to Ford, and dealer reports."  Id.

information requested did not relate to any of Ford's claims or defenses. See ECF No. 71-2 at 15.

Ford served its response to Plaintiffs' first set of interrogatories and requests for production on July 9, 2014. ECF No. 69 at 9. Again, Ford did not identify Kenneth Lilly, did not disclose the inquiry from Transport Canada, and otherwise did not identify any analysis or investigations germane to the defect alleged in the second amended complaint.

### 4. Ford's Recall

On September 2, 2014, Ford informed the National Highway Traffic Safety Administration ("NHTSA") of its intent to perform a voluntary safety recall (Recall No. 14V-526). ECF No. 56 at 1. In its notice, Ford stated:

> The vehicle may experience a sudden partial or full loss of motive power while driving caused by the FMEM strategy during a high temperature condition within the electronics cooling system. If this occurs, the vehicle's braking and steering systems will continue to operate normally. However, this condition can result in a sudden stall-like condition while driving. An engine stall without warning while driving may increase the risk of a crash.

ECF No. 70-6, Ex. E.

Ford offered to notify owners of the Class Vehicles of the potential pump failure and instruct them to take the affected vehicle to a dealer. Id. Ford also offered to replace all of the defective Motor Electronic Cooling Pumps ("MECP") free of charge and reimburse out of pocket repairs for the MECP defect prior to the date of the safety recall notification. Id.

Ford reported the following chronology of events to the NHTSA: in April 2014, Ford began investigating the MECS defect when it "identified reports related to driveability issues, instrument cluster messages instructing the driver to stop the vehicle, and loss of power." Id. During May of 2014, Ford's Critical Concern Review Group then analyzed the issue. Id. From June to August 2015, Ford continued to review data "to understand the cause of the driveability and loss of power reports." Id. On August 25, 2014, the Ford Field Review Committee reviewed the concern and approved the recall. Id. Finally, on September 2, 2014, Ford notified the NHTSA of its intent to perform a safety recall. Id.

Ford's voluntary recall took place over fourteen months after Plaintiffs' sent demand letters requesting the relief offered by the recall and after Plaintiffs' filed this lawsuit. Because the

recall moots many of Plaintiffs' claims, Plaintiffs agree that the only issue at the present time is whether Plaintiffs are entitled to attorneys' fees under a catalyst theory. ECF No. 56 at 2.

## II. LEGAL STANDARD

California's Code of Civil Procedure section 1021.5 provides an exception to the general rule that each party to a lawsuit bears its own attorneys' fees. See Graham v. DaimlerChrysler Corp., 34 Cal. 4th 553, 565 (2004). Section 1021.5 provides that a court may award attorneys' fees to a successful party when the action has resulted in the enforcement of an important right affecting the public interest if:

> (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any.

CAL. CIV. PROC. CODE § 1021.5.

To be entitled to an award of attorneys' fees under section 1021.5, a plaintiff need not obtain a court-ordered change in the defendant's behavior; it is enough when a plaintiff's action motivates the defendant to provide the primary relief sought. Graham, 34 Cal. 4th at 567 (citations omitted). Because it can be difficult to prove causation when a plaintiff seeks to recover under this theory and "action is taken by the defendant after plaintiff's lawsuit is filed," the chronology of events can give rise the inference that the two events are causally related. Californians for Responsible Toxics Mgmt. v. Kizer, 211 Cal. App. 3d 961, 968 (1989) (citation omitted). Defendants can overcome this inference by submitting credible evidence that rebuts the inference raised by the chronology of events. See id. at 969.

Attorneys' fee awards are reviewed for abuse of discretion, and an award will be upheld unless "there is no substantial evidence to support the trial court's findings or when there has been a miscarriage of justice." Bui v. Nguyen, 230 Cal. App. 4th 1357, 1367–68 (2014), review denied (Feb. 25, 2015) (quoting Frei v. Davey, 124 Cal. App. 4th 1506, 1512 (2004)).

## III. DISCUSSION

### A. Whether Plaintiffs Are "Successful Parties"

A plaintiff is a "successful party" under section 1021.5 if "(1) the lawsuit was a catalyst motivating the defendants to provide the primary relief sought; (2) that the lawsuit had merit and achieved its catalytic effect by threat of victory, not by dint of nuisance and threat of expense . . . and, (3) that the plaintiffs reasonably attempted to settle the litigation prior to filing the lawsuit." Tipton-Whittingham v. City of Los Angeles, 34 Cal. 4th 604, 608 (2004).

California law has a "broad, pragmatic view of what constitutes a successful party" within the meaning of section 1021.5. Graham, 34 Cal. 4th at 565. To be a successful party, "[a] favorable final judgment is not necessary." Ebbetts Pass Forest Watch v. California Dep't of Forestry & Fire Prot., 187 Cal. App. 4th 376, 381 (2010) (citing Graham, 34 Cal. 4th at 565). "Plaintiffs may be considered successful if they succeed on any significant issue in the litigation that achieves some of the benefit they sought in bringing suit." Ebbetts Pass Forest Watch, 187 Cal App. 4th at 382 (citing Maria P. v. Riles, 43 Cal. 3d 1281, 1292 (1987)). Significantly here, the relief sought may be obtained from "a voluntary change in the defendant's conduct." Graham, 34 Cal. 4th at 567.

#### 1. Whether the Suit Was a Catalyst That Prompted Defendant to Recall the Class Vehicles

"To be a catalyst, the lawsuit must have been 'a substantial causal factor' contributing to Defendant's conduct, though the lawsuit need not be the only cause of Defendant's conduct." Henderson v. J.M. Smucker Co., No. CV 10-4524-GHK (VBKx), 2013 WL 3146774, at *4 (C.D. Cal. June 19, 2013) (quoting Graham, 34 Cal. 4th at 573). "If plaintiff's lawsuit 'induced' defendant's response or was a 'material factor' or 'contributed in a significant way' to the result achieved then the plaintiff has shown the necessary causal connection." Kizer, 211 Cal. App. 3d at 967 (citations omitted). "[T]he chronology of events may raise an inference that the litigation was the catalyst for the relief." Hogar v. Cmty. Dev. Com. of City of Escondido, 157 Cal. App. 4th 1358, 1366 (2007). Once the inference has been raised, defendants can present evidence to rebut it. See Kizer, 211 Cal. App. 3d at 968. At that point, the court weighs the credibility of the

evidence, see id. at 969–70, although remaining "mindful that 'defendants, on the whole, are usually rather reluctant to concede that the litigation prompted them to mend their ways.'" Klamath Siskiyou Wildlands Ctr. v. Babbitt, 105 F. Supp. 2d 1132, 1139 (D. Or. 2000) (quoting Posada v. Lamb Cnty., 716 F.2d 1066, 1072 (5th Cir. 1983)).

Plaintiffs here argue that the chronology of events supports an inference that this lawsuit was a substantial factor in Ford's decision to recall the Class Vehicles. ECF No. 69 at 5. Beginning in 2005, Ford was aware of MECP failures and stalling problems. See ECF No. 71-2 at 6. Along with issuing Technical Service Bulletins that provided instructions to dealers on diagnosis and repair, Ford made manufacturing changes and design changes to address the MECP failures and stalling. Id. Despite being aware of the MECP failures and resulting stalling problems, however, Ford did not initiate a safety recall. Id.

Plaintiffs then filed their class action complaint in June of 2013 and filed the operative second amended complaint in October of 2013. Plaintiffs allege that "Ford knew or should have known that the Class Vehicles and the MECS coolant pump contain one or more design and/or manufacturing defects." ECF No. 27 ¶ 15. Among the relief Plaintiffs sought, Plaintiffs requested that Ford give notice to all class members about the defective nature of the coolant pump and replace the coolant pump with a suitable alternative. Id. ¶ 136. One month after this Court issued the order denying in part Ford's motion to dismiss, Ford reported that it began to look into the MECP defect. See ECF No. 70-6, Ex. E. Less than six months after the Court issued the order, Ford issued a recall on the Class Vehicles. See id. Here, the chronology of events raises an inference that the lawsuit must have been "a substantial causal factor" contributing to Defendant's decision to recall the Class Vehicles. See Hogar, 157 Cal. App. 4th at 1366.

Ford argues that its evidence, as summarized above, rebuts the inference arising from the chronology of events. ECF No. 71-2 at 5–6. For the following reasons, the Court finds that Ford's evidence does overcome the presumption that the Plaintiffs' lawsuit was a substantial factor in Ford's decision to initiate a voluntary recall.

First, the Court finds it unconvincing that an email inquiry from Transport Canada about one car stalling in a parking lot would trigger Lilly's (re-)analysis of the MECP data and

1    subsequent recommendation to recall the Class Vehicles, even though several complaints to the
2    NHTSA and a class action lawsuit did not.  Lilly stated in his deposition that the ASO has "a
3    process" to look at NHTSA complaints and consumer complaints.[3]  ECF No. 71-4, Ex. B at 69:6–
4    13.  In his response to why the Transport Canada information sparked a formal investigation Lilly
5    stated "the industry view of stalling has changed."  Id. at 69:14–19.  Lilly mentioned that the
6    "NHTSA is always looking at things differently over time . . . becoming more critical."  Id. at
7    169:9–12.  Ford offers nothing to explain, however, why it took the Transport Canada inquiry
8    more seriously than the several complaints to the NHTSA that described similar events and why,
9    even if the industry view was "changing," Ford waited until the Transport Canada incident to
10   delve more deeply into the matter.

11         Second, Ford's timeline relies too heavily on the power of coincidence.  Ford had known
12   about the defect since 2005 and had a department tasked with examining stalling trends that
13   looked at sources including NHTSA complaints, consumer complaints, and lawsuits.  ECF No. 71-
14   2 at 8.  The information from Transport Canada came to Lilly's attention by February 21, 2014.
15   ECF No. 71-4, Ex. B at 167:13-21.  Lilly did not look into the issue until his "workload finally
16   permitted him to follow up."  Id. at 170:4–11; 184: 20–23.  And by happenstance, Lilly's
17   workload lightened shortly after this Court ruled on Ford's motion to dismiss.  As the Public
18   Affairs Officer of the Naval Observatory once said in another context, "This is just too much of a
19   coincidence to be coincidence."  Andrea Thompson, "Mystery Flash Traced To Russian Space
20   Junk," Space on NBC News.com, http://www.nbcnews.com/id/29958635 (Mar. 20, 2009)
21   (accessed Nov. 2, 2015).

22         Third, and most significantly, there are significant holes in Ford's evidence as it pertains to
23   the decision-making process behind the recall or as it pertains to the complaint in this case.
24   Plaintiffs' complaint was reviewed at the company; outside counsel appeared in court to defend its
25   interests; a Ford employee acted the part of the client and gave direction – or at least permission –

---

[3] Ford reports that ASO employees regularly, sometimes on a daily basis, reviewed data from complaints by to the NHTSA, reports from dealers, consumer complaints made directly to Ford, and lawsuits and complaints.  ECF No. 71-2 at 8.

to outside counsel. Possibly, even presumably, that person spoke to other Ford employees about the complaint's allegations and the potential consequences to Ford if it were to lose the lawsuit. But who was this man or woman? Ford does not say. Certainly it was not Mr. Lilly. While Lilly stated he was unaware of this litigation, he also noted that "in most cases" his office receives copies of claims and that "standard practice is that we receive copies of the lawsuits and claims." ECF No. 71-4, Ex. B at 29:23–24; 110:15–18. There were approximately 30 other people in Lilly's department, any one of whom could have received and acted on Plaintiffs' complaint.

Also missing from Ford's evidence is the identity of the person who made the final decision to institute the recall. Was that person, whoever he or she was, aware of Plaintiffs' complaint? Again, Ford does not say. Lilly did not make the decision to recall; he referred the matter to Ford's Critical Concerns Review Group, and Ford personnel then "reviewed *additional data* and developed at action plan." ECF No. 71-2 at 11. The issue was then passed to Ford's Technical Review Group who recommended the recall. Id. Finally, Ford's Field Review Committee approved the recall. Id. Notably, Ford has not described the additional data examined by the Critical Concerns Review Group or the factors specifically weighed by the Technical Review Group[4] and the Field Review Committee in initiating the recall. Ford has not offered declarations from the final decision makers who actually recommended and approved the 2014 recall. What role this lawsuit played in their decisions is unknown.

The Henderson case is instructive. In that case, the plaintiff sued the defendant for making allegedly false health claims about its food products. Henderson, 2013 WL 3146774, at *1. The defendant argued that the suit was not a catalyst because the defendant was already in the process of making the requested changes to the food products before the lawsuit. Id. at *5. The plaintiff filed her lawsuit in June 2010 and served the complaint on defendant in September 2010. In October 2010, employees within defendant's research and development department began discussing ways of removing trans fat. Id. The Henderson court found that the chronology of

---

[4] Ford's description of its recall procedure notes that the Technical Review Group membership typically includes employees from Ford's engineering group, public affairs, as well as those from the Office of the General Counsel. See ECF No. 71-5, Ex. C.

events gave rise to the inference that the lawsuit was a catalyst as to the removal of trans fat from defendant's "Uncrustables" product. Id. The court then found the defendant offered "little contemporaneous evidence to show that it had a plan to reformulate [the product at issue] independent of Plaintiff's lawsuit." Id. The defendant's "general goal to reduce or eliminate trans fat . . . [did] not rebut [plaintiff's] assertion that her lawsuit prompted [the defendant] to prioritize the reformulation of [the product at issue] in particular." Id. The fact that the defendant did not have "any specific plan or timetable to remove trans fat" also cast doubt on the defendant's argument. Id. Finally, the court found that an email stating that defendant wanted to "provide a cleaner label" did "not preclude plaintiff's lawsuit as motivating [d]efendant's desire to 'provide a cleaner label'" because the purpose of the email was primarily to arrange a conference call. Id. at *7.[5]

Similarly here, the Court finds there is not enough convincing contemporaneous evidence to rebut the inference from the chronology of events and show that Plaintiffs' lawsuit did not catalyze Ford's recall decision. Henderson, 2013 WL 3146774, at *7.

### 2. Whether the Lawsuit Had Merit

Under the catalyst theory, a lawsuit has merit if it is not "frivolous, unreasonable or groundless . . . ." Graham, 34 Cal. 4th at 575. "At the very least, a plaintiff must establish the precise factual/legal condition that it sought to change or affect as a prerequisite for establishing the catalytic effect of its lawsuit." Id. at 576. This requirement is "designed to screen out nuisance suits." Id.

The Court finds that this lawsuit had merit. Plaintiffs alleged that the Class Vehicles contained a defective coolant pump within the MECS that caused the Class Vehicles to shut down unexpectedly and that Ford knew or should have known of this defect. ECF No. 27. Plaintiffs requested relief including: a declaration that Ford be financially responsible for notifying all Class Members about the defective nature of the coolant pump; an order enjoining Ford from further

---

[5] By contrast, the court did find that plans to remove the "wholesome" and "homemade goodness" claims predated the litigation because defendant provided mock-ups of the product package that did not include the language. Id. at *7. This suggested that the defendant independently decided to remove the language even before becoming aware of the suit. Id.

10

deceptive distribution, sales, and lease practices; and an order requiring Ford to replace the defective coolant pumps. Id. ¶ 136. In its recall, Ford notified all owners of the Class Vehicles about the potential pump failure and offered to replace the current pumps with improved pumps at no charge to owners. ECF No. 56 at 1–2. Plaintiffs sufficiently established "the precise factual/legal condition" that they sought to change. See Graham, 34 Cal. 4th at 576. Accordingly, the Court concludes that Plaintiffs lawsuit was not "frivolous, unreasonable, or groundless." Id. at 575.

### 3. Whether Plaintiffs Reasonably Attempted to Settle the Litigation Prior to Filing the Suit

A plaintiff seeking attorneys' fees under a catalyst theory must first reasonably attempt to settle the matter short of litigation. Id. at 577. "Lengthy prelitigation negotiations are not required, . . . a plaintiff must at least notify the defendant of its grievances and proposed remedies and give the defendant the opportunity to meet its demands within a reasonable time period." Id. The California Court of Appeal has held that this requirement may be excused where such attempts would have been futile. Cates v. Chiang, 213 Cal. App. 4th 791, 815 (2013), reh'g denied (Feb. 26, 2013), review denied (May 15, 2013).

Before determining whether this condition has been satisfied, the Court must determine what the appropriate rule is. "When the state supreme court has not ruled definitively on a point, this court looks to decisions by intermediate appellate state courts for guidance." State Farm Fire & Cas. Co. v. Abraio, 874 F.2d 619, 621 (9th Cir. 1989) (citation omitted). The district court should follow a California intermediate appellate court's decision "unless there is *convincing evidence* that the state supreme court would decide differently." Id. (emphasis added). Thus, this Court must follow Cates in the absence of convincing evidence that the California Supreme Court would rule differently.

Ford argues that Cates was wrongly decided "because ignores the categorical bright-line rule set out by the California Supreme Court in Graham." ECF No. 78 at 9. Ford's argument is unconvincing for two reasons.

First, Ford buries it in a footnote with no explanation beyond the language just quoted.

11

"Many courts will disregard arguments raised exclusively in footnotes." Sanders v. Sodexo, Inc., No. 2:15-CV-00371-JAD, 2015 WL 4477697, at *5 (D. Nev. July 20, 2015) (quoting Bryan Garner, THE REDBOOK: A MANUAL ON LEGAL STYLE 168 (3d ed.2013)); Rock Creek Alliance v. U.S. Fish & Wildlife Serv., 390 F. Supp. 2d 993, 998 (D. Mont. 2005) (disregarding arguments set forth in footnotes). Second, turning to the merits, the Cates court did not "ignore" the rule in Graham requiring a pre-litigation settlement demand. Rather, it thoughtfully analyzed that court's decision as well as subsequent authority, and concluded that because the rule was "judicially-created . . . to promote the purposes of section 1021.5 and deter attorneys from filing meritless suits merely to obtain attorney fees, it should not be applied to bar an attorney fees recovery where to do so would defeat the core purpose of the statute." Cates, 213 Cal. App. 4th at 816.

Ford has not met its burden of demonstrating with convincing evidence that the California Supreme Court would decide this issue differently than Cates did. Accordingly, a movant for catalyst fees need not submit evidence of a pre-litigation settlement demand where it is established that such a demand would have been futile. See also Henderson, 2013 WL 3146774, at *10 (following Cates).

Here, the Parties agree that any attempt by Plaintiffs to settle this case would have been futile. ECF No. 69 at 14–15; ECF No. 69-11, Zohdy Decl., Ex. 10. Therefore, no rights would have been "vindicated by reasonable efforts short of litigation." Graham, 34 Cal. 4th at 577. Plaintiffs are not barred from recovery under section 1021.5 for not attempting to settle before filing their lawsuit.

### B. Whether the Lawsuit Resulted in the Enforcement of an Important Right Affecting the Public Interest

Section 1021.5 allows courts to award attorneys' fees if an action "resulted in the enforcement of an important right affecting the public interest." CAL. CIV. PROC. CODE § 1021.5. "[S]ection 1021.5 requires both a finding of a significant benefit conferred on a substantial number of people and a determination that the "subject matter of the action implicated the public interest." Graham, 34 Cal. 4th at 578 (quoting Beasley v. Wells Fargo Bank, 235 Cal. App. 3d 1407, 1418 (1991)). The "enforcement of the California consumer protection laws" qualifies as "an important

right affecting the public interest." Henderson, 2013 WL 3146774, at \*10 (quoting Colgan v. Leatherman Tool Grp., Inc., 135 Cal. App. 4th 663, 703 (2006)).

The Court finds that the interests underlying Plaintiffs' claims under the CLRA and UCL, which sought to enforce California's consumer protection laws, are important rights affecting the public interest. See Graham, 34 Cal. 4th at 578. The Parties also stipulate that "the right to have a defect related to motor vehicle safety repaired" is an important right. ECF No. 69 at 14–15; ECF No. 69-11, Zohdy Decl., Ex. 10. The Court also finds that having safety-related car defects recalled and repaired is an important right affecting the public interest.

Plaintiffs have satisfied section 1021.5's requirement that the action have "resulted in the enforcement of an important right affecting the public interest." CAL. CIV. PROC. CODE § 1021.5.

### C. Whether a Significant Benefit Has Been Conferred on the General Public or a Large Class of Persons

"'The trial court must determine the significance of the benefit and the size of the class receiving that benefit by realistically assessing the gains that have resulted in a particular case.'" Baxter v. Salutary Sportsclubs, Inc., 122 Cal. App. 4th 941, 945 (2004) (quoting Flannery v. California Highway Patrol, 61 Cal. App. 4th 629, 635).

Ford's nationwide recall involved 2005–2008 Ford Escape hybrid vehicles and 2006–2008 Mercury Mariner hybrid vehicles. In its notice to the NHTSA, Ford estimated that the recall affects 70,209 vehicles. ECF No. 70-6, Ex. E. The Parties stipulate, and the Court agrees, that the recall of the Class Vehicles conferred a significant benefit on the general public or a large class of persons. ECF No. 69 at 14–15; ECF No. 69-11, Zohdy Decl., Ex. 10; see also Graham, 34 Cal. 4th at 561 (concluding that a significant benefit was conferred to the large class of persons where the defendant had offered to buy back the 7,000 vehicles leased or sold).

### D. Whether the Necessity and Financial Burden of Private Enforcement Makes the Award Appropriate

Section 1021.5 requires that "the necessity and financial burden of private enforcement . . . are such as to make the award appropriate." CAL. CIV. PROC. CODE § 1021.5. "[T]he "necessity . . . of private enforcement" has long been understood to mean simply that public enforcement is not available, or not sufficiently available." In re Conservatorship of Whitley, 50

1   Cal. 4th 1206, 1217 (2010) (citations omitted). "[N]ecessity is shown where public enforcement of
2   the right affecting the public interest in the case 'is inadequate.'" Bui, 230 Cal. App. 4th at 1367,
3   (citing Collins v. City of Los Angeles, 205 Cal. App. 4th 140, 154 (2012)). As with each of
4   section 1021.5's prerequisites, the burden is on the moving party to show that the necessity and
5   financial burden of private enforcement makes an award appropriate. See Bui, 230 Cal. App. 4th
6   at 1365 (citations omitted).

Ford disputes that private enforcement was necessary in this case.[6] See ECF No. 71 at 17–19. Ford relies on Bui to support its argument that Plaintiffs cannot show that private enforcement was necessary because Plaintiffs themselves did not make an inquiry to, or seek assistance from, the NHTSA to enforce their rights. Id. at 15. In Bui, a jury awarded the plaintiff $150,000 in damages based on a negligence claim regarding dental work. Bui, 230 Cal. App. 4th at 1361. Three weeks after the trial, plaintiff obtained an injunction against the defendant and made a post-judgment motion for attorneys' fees under section 1021.5. Id. at 1361. The injunction required the defendant, who was not a licensed dentist, to identify herself as a dental assistant and to not wear a white dentist coat. Id. at 1362. The post-judgment motion was the "first indication" by the plaintiff that he sought "equitable relief concerning alleged unlawful business practices." Id. at 1363. The Court of Appeal held the plaintiff did not "establish that private enforcement was necessary to protect the public from false advertising by [the defendant]." Id. at 1362. In denying fees under section 1021.5, the trial court found evidence that "[t]here had apparently been prior complaints filed, all of which had resulted in no action being taken or insufficient evidence being adduced to allow action to be taken," id. at 1371, but the Court of Appeal found no evidence of such complaints. Id. The record reflected only conclusory declarations stating that enforcement agencies would not be interested. Id. Thus, the Court of Appeal found there was no reasonable basis to conclude that private enforcement was necessary because the trial court's order was not supported by evidence. Id. at 1377.

---

[6] Ford does not dispute that the financial burden of private enforcement makes the award appropriate. See ECF No. 71 at 17–18. The Court finds that bringing a class action lawsuit constitutes a financial burden.

14

The facts in the present case are distinguishable. Plaintiffs' complaint alleges that several Ford customers complained about the MECP defect to the NHTSA. ECF No. 27 ¶¶ 13, 54. Although Plaintiffs themselves did not call NHTSA's attention to the defect, other Ford consumers had previously complained to the NHTSA. At the time Plaintiffs commenced this lawsuit, however, NHTSA had not commenced a parallel action and "no government action was being taken to vindicate" Plaintiffs' rights. This finding, combined with the fact that Ford would not have entertained any pre-litigation settlement (discussed above), is sufficient to show that necessity and financial burden of private enforcement makes the award appropriate. See Henderson, 2013 WL 3146774, at *13; Robinson v. City of Chowchilla, 202 Cal. App. 4th 382 (2011). Unlike in Bui, there is record evidence to support this finding.

## IV.   EVIDENTIARY OBJECTIONS

Ford objects to Exhibit B to the Declaration of Tarek H. Zohdy in support of Plaintiffs' Reply to Defendant's Opposition to Plaintiffs' Motion for Attorneys' Fees. ECF No. 81. Ford argues that the declaration, which includes an excerpt from two tables produced by Ford to the Plaintiffs, is not authenticated or relevant and is hearsay. Id. at 1–2.

Under Federal Rule of Evidence 901 "the proponent [of an item of evidence] must produce evidence sufficient to support a finding that the item is what the proponent claims it is." FED. R. EVID. 901(a).[7] Ford relies on Yeager to argue that Exhibit B is not properly authenticated. ECF No. 81 at 1. Yeager involved a dispute over authenticating invoices submitted by one attorney to calculate fees by the previous attorney on the case. Yeager, 2012 WL 6629434, at *3. The defendant in Yeager objected to the invoices submitted by the plaintiff's counsel contending that counsel did not have "sufficient personal knowledge to authenticate those invoices" and thus, the plaintiff "failed to proffer competent evidence that those services were rendered and those fees incurred." Id. at 2.

Yeager is inapposite here. During discovery, Ford produced the documents and now

---

[7] The Federal Rules of Evidence apply to diversity cases. Yeager v. AT & T Mobility, LLC, No. CIV S 07–2517 KJM GGH, 2012 WL 6629434, at *3 (E.D. Cal. Dec. 19, 2012) (citations omitted).

15

objects to Plaintiffs' submission. ECF No. 84 at 1. Ford turned over the documents with a cover letter stating the document contains "FMC360/MORS and DCQIS records" and the document included the "Bates Range: MCN3 009661." See Id., Ex. A. Ford requested that the documents be filed under seal. ECF No. 82. And in its objection to Plaintiffs' reply, Ford then attached the complete, "true and correct" version of the document containing the table segment Plaintiffs submitted. See ECF No. 81, Ex. A. The Court finds that the document, which is a record held by Ford, produced by Ford, requested to be sealed by Ford, and asserted by Ford to be "true and correct copies," was sufficiently authenticated.

Next, Ford argues the documents to which Plaintiffs refer are hearsay. Id. at 2. To qualify as hearsay, the statement must be made not while testifying and the proponent of the statement must be offering it to prove the truth of the matter asserted. FED. R. EVID. 801(c). However, in their Reply brief, Plaintiffs use the Zohdy Declaration and Exhibit B to support their argument that Ford *knew* of at least two alleged accidents resulting from the MECP defect. See ECF No. 79 at 8. Plaintiffs assert that Ford had knowledge of the events, not that the events were true. See United States v. Rogers, 321 F.3d 1226, 1229 (9th Cir. 2003) (document properly admitted for the non-hearsay purpose of showing defendant had notice).

Last, Ford argues the exhibit is not relevant. ECF No. 81 at 2. To be relevant, evidence must have "any tendency to make a fact more or less probable than it would be without the evidence" and that fact must be "of consequence in determining the action." FED. R. EVID. 401. Plaintiffs' allege that the Class Vehicles were defective and that Ford knew or should have known about the defect. Complaints made to Ford and catalogued by Ford about the loss of power in 2008 Ford Escape hybrid vehicles are relevant to Plaintiffs' argument about Ford's knowledge of the complaints made about the Class Vehicles.

Ford's objections to Exhibit B are overruled.

## CONCLUSION

For the reasons explained above, the Court grants Plaintiffs' motion for fees. Within thirty days of this order, Plaintiffs will submit a motion for attorneys' fees. Ford may file an opposition within fourteen days thereafter. Plaintiffs may file any reply to the opposition within seven days

16

1  thereafter.
2      IT IS SO ORDERED.
3  Dated: November 2, 2015

_____
JON S. TIGAR
United States District Judge